Gary SUITS, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 2–1282A425.

Court of Appeals of Indiana, Second District.

July 28, 1983.

---

Bruce M. Frey, Marion, for appellant.

Linley E. Pearson, Atty. Gen., Gordon R. Medlicott, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Gary Suits (Suits) appeals from four convictions for check deception, a class A misdemeanor, I.C. 35-43-5-5 (Burns Code Ed.,

Supp.1982).[1]  Suits raises three issues on appeal:

1) whether the trial court denied Suits his right to counsel by denying his motion for continuance to obtain counsel;

2) whether the trial court denied Suits his right to a jury trial by denying his request on the day of trial; and

3) whether the evidence is sufficient to support his convictions in three of the charged offenses.

We reverse.

### FACTS

Suits appeared by counsel on February 24, 1982 and moved for a continuance of his arraignment.[2]  The trial court granted the motion.  Suits failed to appear for the arraignment scheduled March 10, 1982.  On March 12, 1982, Suits appeared *without* counsel and was arraigned on all four charges.  At arraignment the trial court advised Suits of his rights to counsel and to a jury trial and set the trials for March 30, 1982.  On the day of the trial, Suits appeared *without* counsel.  At that time the trial court informed Suits the state bore the burden of proving its case beyond a reasonable doubt, he need not testify if he wished, if he did testify the state could cross-examine him, and he had the right to change his plea.  The trial court thereupon asked Suits if he wished to change his plea or to proceed to trial.  Suits replied,

> "Ah, your Honor, I do not wish to change my plea, but, . . . I am in the process of hiring an attorney to handle this for me and I would request that . . . a continuance be made until I can get with my attorney to let him take care of the matter for me."

Record at 75.

The following exchange then took place:

"THE COURT:  Mr. Suits, you've been telling me that you're in the process of hiring an attorney since February the twenty-fourth of eighty-two when you were here by counsel, Ross Rowland.  A continuance was granted at that time for arraignment and you simply failed to appear.  Now, I think that the Court has given you adequate time.  You have been represented by counsel and apparently you couldn't come to terms with that counsel.  Now, I'm not going to keep continuing this case to give you a chance to hire counsel that suits you.  Now, the witnesses are here and we are going to proceed with the trial.  Proceed, please.

"MS. LANTZ:  Thank you, your Honor.

"Mr. SUITS:  Your Honor, ah, excuse me, please.  At the arraignment, you said I had a right to a jury trial?

"THE COURT:  If you ask at a timely manner, you have the right to a jury trial.

"MR. SUITS:  Well, this is what the attorney was supposed to ask for me, your Honor.  Ah, I had spent almost a week trying to get in touch with Mr. Steven Smith from Anderson, but he was involved in a very lengthy trial here in Delaware County.  Ah, then after the trial was over and I finally did reach Mr. Smith, I found out that he could not represent me due to a conflict of interest.  So, therefore, I had talked to Mr. Dunnuck last Friday and the retainer was supposed to have been taken to, excuse me, your Honor, to him either today or tomorrow, so that Mr. Dunnuck can represent me in this matter.  Arrangements have been made for my retainer fee to be taken to him.

"THE COURT:  Now, Mr. Dunnuck did not contact this Court and Mr. Dunnuck knows that if he, ah, was, if there was

---

1. I.C. 35–43–5–5 (Burns Code Ed., Supp.1982) provides, in pertinent part:

   "(a) A person who knowingly or intentionally issues or delivers a check, draft, or order on a credit institution for the payment of or to acquire money or other property, knowing that it will not be paid or honored by the credit institution upon presentment in the usual course of business, commits check deception, a class A misdemeanor."

2. At the time, I.C. 35–4.1–1–1 (Burns Code Ed., Repl.1979) calling for an arraignment rather than an initial hearing, was in effect.  *Cf.* I.C. 35–33–7–4 (Burns Code Ed., Supp.1982).

even a chance that he might represent you, then he would enter his appearance and if you didn't work out terms with him, then he would withdraw his appearance. Now, we are going to trial.

"MR. SUITS: Okay, your Honor.

"THE COURT: Alright. Proceed."

Record at 76–77.

## I.

■ The granting of continuances on non-statutory grounds is a discretionary decision by the trial court and as such, may only be reviewed and reversed by this court for an abuse of that discretion. *Yager v. State,* (1982) Ind., 437 N.E.2d 454, 461. "The facts in each case determine whether a denial of request for continuance to obtain counsel is a violation of Article 6 [sic] of the Amendments to the Constitution." *Vacendak v. State,* (1982) Ind., 431 N.E.2d 100, 105. The United States Supreme Court spoke to the issue of continuance motions to obtain counsel in *Ungar v. Sarafite,* (1964) 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921. The Court said,

. "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.

There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be bound in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."

(Citations omitted.). Finally, a defendant who can afford to hire counsel may not abuse his right to counsel, thereby disrupting the judicial process, either by unreasonably delaying employing counsel of his choice or in repeatedly discharging retained counsel. *Yager v. State,* 437 N.E.2d at 461;

*Vacendak v. State,* 431 N.E.2d at 105; *Works v. State,* (1977) 266 Ind. 250, 256, 362 N.E.2d 144, 147; *Hardy v. State,* (1982) Ind.App., 436 N.E.2d 837, *transfer denied.*

■ Suits did not waive his right to counsel by any such conduct. Rather, the trial court abused its discretion in denying Suits' motion for a continuance. The trial court's insistence upon expeditiousness in the face of a justifiable request for delay" rendered Suits' "right to defend with counsel an empty formality." *Ungar,* 376 U.S. at 589, 84 S.Ct. at 849.

*Fitzgerald v. State,* (1970) 254 Ind. 39, 257 N.E.2d 305 is on point. *Fitzgerald* concerned a defendant who over a one and one-half year period made, in the words of our supreme court, "a determined effort . . . to avoid being tried at all and to bring about delay and disruption of the criminal proceedings through his own inaction." 254 Ind. at 47, 257 N.E.2d at 311. Nevertheless, the supreme court held the trial court abused its discretion saying:

"Although we believe that the conduct of the appellant had reached the point where remedial action by the court was indicated, we believe that the trial judge had other means at his disposal short of proceeding with the trial, with which to deal with the situation in this case. The court, in its judicial discretion, could have appointed an attorney to handle appellant's defense conditioned on the payment of the legal fees by appellant. Alternatively the court could have granted appellant a further continuance to renew his 'efforts' in securing a lawyer, such efforts to be inspired by the clear warning by the court that failure to secure such counsel would be deemed an interference with the administration of justice and punishable as contempt. Either one of these actions or a combination of the two by the trial court would seem adequate to bring the appellant to trial.

"Proceeding with the trial as occurred in this case, in light of the mandates of the U.S. and Indiana Constitutions and prior case law decided thereunder, was improper, irrespective of how strongly we

are convinced that appellant sought to avoid said trial. Without a clear waiver, certain constitutional rights, such as the assistance of counsel, must be afforded the defendant about to be tried. As we have indicated, however, the trial court is not powerless where a defendant attempts to prostitute the system and thwart the ends of justice."

*Id.* at 48–49, 257 N.E.2d at 312. *Fitzgerald* is dispositive in the circumstances of the instant case where the trial court denied Suits' *first* motion for a continuance of his *trials* to obtain counsel made within 20 days after the cases were first set for trial.

Suits is entitled to reversals on all four convictions. We consider the question of whether he can be retried below in Issue III.

## II.

■ Suits raises the issue of whether the trial court denied him his right to a jury trial. We hold Suits did not waive his right to a jury trial. Suits is entitled to a trial either by bench or by jury. I.C. 35–1–34–1 (Burns Code Ed., Repl.1979) (superseded by 35–37–1–2 (Burns Code Ed., Supp.1982) effective September 1, 1982).

However, Suits' charged offenses are misdemeanors. The right to trial by jury in misdemeanor cases is controlled by Ind. Rules of Procedure, Criminal Rule 22, adopted January 1, 1981. C.R. 22 (emphasis added) states:

"A defendant charged with a misdemeanor may demand a trial by jury by filing a written demand therefore not later than ten (10) days before his scheduled trial date. The failure of a defendant to demand a trial by jury as required by this rule shall constitute a waiver by him of trial by jury *unless the defendant*

**3.** Suits does not contest the sufficiency of the evidence in CDC1–82–90.

**4.** "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V, cl. 2.

**5.** There can be no balancing of equities where the Double Jeopardy Clause is concerned.

*has not had at least fifteen (15) days advance notice* of his scheduled trial date and *of the consequences of his failure to demand a trial by jury.*"

Suits was advised at his arraignment he had a right to a trial by jury, Record at 63, but he was not informed of the consequences of his failure to demand a trial by jury. That information came to him only on the day of trial. Record at 76, *see supra,* at 378. The trial court did not follow C.R. 22.

## III.

■ Suits' final issue is whether the evidence is sufficient to support his convictions in CDC1–82–165, CDC1–82–209 and CDC1–82–210.[3] On appeal we neither reweigh the evidence nor judge the credibility of the witnesses. We consider only the evidence favorable to the state and all the reasonable inferences drawable therefrom. If there is substantial evidence of probative value on each element of the offense, then we must affirm. *Napier v. State,* (1983) Ind., 445 N.E.2d 1361. Our examination of the evidence is crucial as it determines whether our instructions to the trial court are to order new trials or to order acquittals.

■ The Double Jeopardy Clause[4] forbids retrial for those offenses where the prosecution has had a fair opportunity to present the available proof of the offense charged.[5] *Burks v. United States,* (1978) 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1. *Burks* formulated the rule that where the reviewing court finds a clear failure of proof by the state, the only remedy is to direct an acquittal. *Id.* at 18, 98 S.Ct. at 2150.

Chief Justice Burger carefully distinguished reversal for insufficient evidence from reversal for trial error:

"Nonetheless, where the Double Jeopardy Clause is applicable, its sweep is absolute. There are no 'equities' to be balanced, for the Clause has declared a constitutional policy, based on grounds which are not open to judicial examination."

*Burks v. United States,* (1978) 437 U.S. 1, 11 n. 6, 98 S.Ct. 2141, 2147 n. 6, 57 L.Ed.2d 1.

"As such, [trial error] implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect.... Where this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished....

"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble.

.    .    .    .    .

"[T]he purposes of the Clause would be negated were we to afford the government an opportunity for the proverbial 'second bite at the apple.'"

*Id.* at 15–16, 17, 98 S.Ct. at 2149, 2150.

■ Indiana follows the *Burks* rule. *Morgan v. State,* (1982) Ind., 440 N.E.2d 1087; *Webster v. State,* (1980) Ind., 413 N.E.2d 898; *Mulry v. State,* (1980) Ind. App., 399 N.E.2d 413. In applying the *Burks* rule to the cases at hand, we find the evidence insufficient on CDC1–82–165, CDC1–82–209 and CDC1–82–210.

■ I.C. 35–43–5–5(d) states:

"(d) The following two [2] items constitute prima facie evidence of the identity of the maker of a check, draft, or order if at the time of its acceptance they are obtained and recorded, either on the check, draft, or order itself or on file, by the payee.

(1) Name and residence, business, or mailing address of the maker.

(2) Motor vehicle operator's license number, social security number, home telephone number, or place of employment of the maker."

Nevertheless, the state must still prove beyond a reasonable doubt the defendant is the issuer or deliverer of the check. This burden requires more than identifying the defendant and noting the defendant's name is the same as the name on the check or checks. *State v. Martin,* (1981) Ind.App., 422 N.E.2d 433; *Caudle v. State,* (1980) Ind.App., 404 N.E.2d 57.

■ In CDC1–82–165 and CDC1–82–209 the record is devoid of any identification of the defendant Suits as the maker or deliverer Suits. Therefore, the evidence is insufficient and Suits must be granted acquittals on these charges.[6]

---

**6.** In CDC1–82–165 the evidence on identity is limited to the following direct examination of the state's witness:

"Q. What are your duties as a Credit Manager?
A. One of my duties as a Credit Manager is to follow-up returned checks.
"Q. And, ah, in that capacity, did you follow-up a check written by Gary Suits?
A. Yes. I did.
Q. I'm handing you what's been marked as State's Exhibit A. Is that the check from Gary Suits?
A. Yes. This is the check."
Record at 225–26.

In CDC1–82–209 the evidence on identity consists of the following direct examination of the state's witness:

.   .   .   .   .

"Q. On December the tenth, nineteen eighty-one, ah, did Gary Suits, ah, write a check to Allen Cox and leave it with Shidler Oil Company? [Exhibit A]
A. He might have, he wrote it to an employee of mine.

.   .   .   .   .

Q. I see. And, ah, what is the signature on that check?
A. Gary Suits.

.   .   .   .   .

Q. Now, I'm handing you what's marked State's Exhibit B. Ah, that also a check?
A. Yes. It is.
Q. And, who wrote that check?
A. Gary Suits. I would say he did.

.   .   .   .   .

Q. Now, I'm handing you, Mr. Shidler, State's Exhibit C. Is that also a check?
A. Yes. It is.
Q. And, it's written by whom?
A. Gary Suits.

.   .   .   .   .

Q. Now, I'm handing you State's Exhibit D, Mr. Shidler. What is that exhibit?
A. From Gary Suits to Allen Cox for labor. Twelve-twelve of eighty-one. Check number one-eighty-seven."
Record at 372–73, 375, 377.

In CDC1–82–210 Suits argues the evidence is insufficient because the state failed to introduce evidence he was given a ten day notice of dishonor.

■ I.C. 35–43–5–5(e) (Burns Code Ed., Supp.1982) (emphasis added) provides:

"(e) It is a defense under subsection (a) if a person who:

(1) Has an account with a credit institution but does not have sufficient funds in that account; and

(2) Issues or delivers a check, draft, or order for payment on that credit institution; *pays the payee or holder the amount due,* together with protest fees and any service fee or charge, not exceeding ten dollars [$10.00], which may be charged by the payee or holder, *within ten [10] days after the date of mailing by the payee or holder of notice to the person that the check, draft, or order has not been paid by the credit institution.* Notice sent to either (i) the address printed or written on the check, draft, or order or (ii) the address given by the person in writing to the payee at the time the check, draft, or order was issued constitutes notice to the person that the check, draft, or order has not been paid by the credit institution. The payee or holder of a check, draft, or order that has been dishonored incurs no civil or criminal liability for sending notice under this subsection."

Relying on this provision Suits contends the written notice of nonpayment is an element of the offense of check deception. We agree.

Prior to the 1981 amendment this subsection read:

"(e) A person who:

(1) Has an account with a credit institution but does not have sufficient funds in that account; and

(2) Issues or delivers a check, draft, or order for payment on that credit institution; does not commit a crime under subsection (a) of this section if he *pays the payee or holder the amount due,* together

with protest fees and any service fee or charge, not exceeding ten dollars [$10.00] which may be charged by the payee or holder, *within twenty [20] days after the date of mailing by the payee or holder of notice to the person that the check, draft, or order has not been paid by the credit institution.* Notice sent to either (i) the address printed or written on the check, draft, or order or (ii) the address given by the person in writing to the payee at the time the check, draft, or order was issued constitutes notice to the person that the check, draft, or order has not been paid by the credit institution. The payee or holder of a check, draft, or order that has been dishonored incurs no civil or criminal liability for sending notice under this subsection."

I.C. 35–43–5–5(e) (Repl.1979) (emphasis added).

■ Thus, the 1981 amendment substituted a ten (10) day notice for the previous twenty (20) and substituted the "defense" language for the language "does not commit a crime." The question, then, is whether this latter substitution reflects a legislative intent to overrule *Vargo v. State,* (1981) Ind.App., 429 N.E.2d 291, which held the sending of notice of nonpayment was an element of the offense. We hold the intent of the substitution is to make *payment* a defense; the substitution has no effect on the element of notice.

■ A construction which includes notice as part of the defense would place control of the availability of the defense in the hands of the payee or holder. The holder or payee could totally deprive a defendant of the defense of payment by intentionally not mailing notice of nonpayment and thereby nullifying the legislature's intent that such a defense can and should exist. Thus, the only interpretation that gives viability to the legislature's expressed intent that a defense shall exist is the construction that the defense is timely payment after the state has proven the element of mailing notice of nonpayment.

Therefore, because the record is devoid of evidence of mailing notice of nonpayment, Suits' conviction under CDC1–82–210 must be reversed and an acquittal entered.[7]

Judgment reversed and remanded for a new trial in cause CDC1–82–90 and for the entry of a judgment of acquittal in causes CDC1–82–165, CDC1–82–209 and CDC1–82–210.

BUCHANAN, C.J., and SULLIVAN, J., concur.

---

7. The only evidence of notice is as follows: "Q. And, as owner of Clyde's Liquor Store, do you, ah, follow up on the bad checks that are written to your store?
A. We try to. Yes.
Q. Yes. And, ah, did you receive any checks from Gary Suits?
A. Yes. The two presented.
Q. Ummhumm. What did you do to, to, ah, collect on those two, on those checks?
A. The first one dated January the thirtieth.
MS. LANTZ: Ummhumm.
A. ... which is on a Saturday, then when I did my book work on Sunday and made by bank deposit ...
MS. LANTZ: Ummhumm.
A. ... I, of course, deposited that check and then on Tuesday, when I went through my books or through the money again, I see this second check ...
MS. LANTZ: Yes.
A. ... for seventy-eight dollars and uh, I immediately became suspicious, so ...
MS. LANTZ: Ummhumm.
A. ... I called Mutual Home to see if the account, to see if the check would clear and at that time, so that would have been about February the third, the second or third.
MS. LANTZ: Ummhumm.
A. And they said no, it would not clear. Ah, the phone number on the reverse side of the check, I called it and it seems there was a young lady that answered the phone.
MS. LANTZ: Ummhumm.
A. ... and said that Mr. Suits, this was in the afternoon, that he wouldn't, wasn't home, but would be and I could call later that evening and she hung up on me then.
Q. Ummhumm. Did you indicate to her at that time why you, the purpose of your call?
A. I told her, yes. It was Clyde's Liquor, I was the owner of Clyde's Liquor and I was calling about a check that would not clear.
Q. Ummhumm. Ah, did you, ah, try to call them any other time?
A. No. I never attempted to call the house after that. Never did. Not at that two-eight-eight number that he put on there, but I did call Mutual Home two more times ...
MS. LANTZ: Ummhumm.
A. ... Ah, possibly in the next week to ten days, I made two more calls and the third call, the lady at Mutual Home just told me that, she said, well this account has been overdrawn since last October, so, that's the reason I didn't send the check through, the second check through. The first one did come back and she told me that there hadn't been any checks even cleared that account since the preceding October, so I didn't see any reason to send the second one through." Record at 525–27.