**Gerald CASSELMAN, Jr.,
Defendant-Appellant,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

**No. 3–1183A362.**

Court of Appeals of Indiana,
Third District.

Jan. 17, 1985.

Susan K. Carpenter, Public Defender, M.E. Tuke, Deputy Public Defender, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Theodore E. Hansen, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

After a bench trial Gerald Casselman was convicted of resisting law enforcement, a Class A misdemeanor. Our consideration of the first issue raised by Casselman attacking the sufficiency of the evidence requires that we reverse his conviction.[1]

When reviewing the sufficiency of the evidence to support a conviction we consider only the evidence most favorable to the state and all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value to support each element of the offense, then we will affirm the trial court. *Napier v. State* (1983), Ind., 445 N.E.2d 1361, 1366.

The evidence viewed in light of the above standard reveals that Casselman was having difficulty paying his debts and was under pressure from creditors. He contacted an attorney, Larry Barkes, for preparation of a petition for bankruptcy. The petition was filed and an automatic stay was entered on August 5, 1982. Barkes told Casselman that if anyone approached him regarding a debt he should inform the person of the bankruptcy proceedings and direct the person to contact Barkes. He also told Casselman that because of the stay, Casselman did not have to attend a scheduled hearing on a motion for proceedings supplemental arising from a judgment entered against Casselman in a suit brought by General Electric Corporation (G.E.). However, neither Barkes nor Casselman informed the court of the bankruptcy or the automatic stay.

Casselman twice failed to appear at hearings on G.E.'s motion assertedly believing the automatic stay allowed him to do so. After Casselman's first failure to appear, the court had a citation served upon him ordering him to appear and show cause why he should not be held in contempt. *See* IC 34-4-9-1. After Casselman's second failure to appear, the court issued a writ of attachment of the body pursuant to IC 34-4-9-2.1 ordering the sheriff to take Casselman into custody.

On November 10, 1982 Deputy Sheriff James Wofford drove to Casselman's residence to serve the writ. He knocked on the front door, and when he received no response, went around to the side of the house to a sliding glass door. He knocked again and Casselman came to the door. Wofford asked if he was Gerald Casselman, Jr. When Casselman responded that he was, Wofford displayed his identifica-

---

1. Had we not found reversible error in the sufficiency of the evidence, we would still be required to reverse Casselman's conviction. He additionally asserts, and we agree, that it was fundamental error for the court to deny him a jury trial without first eliciting a waiver from him personally.

Criminal Rule 22 provides:

"A defendant charged with a misdemeanor may demand a trial by jury by filing a written demand therefor not later than ten (10) days before his scheduled trial date. The failure of a defendant to demand a trial by jury as required by this rule shall constitute a waiver by him of trial by jury unless the defendant has not had at least fifteen (15) days advance notice of his scheduled trial date and of the consequences of his failure to demand a trial by jury."

The state urges that since Casselman failed to demand a jury as provided by the rule, no error was committed. The argument is specious. If the rule is, itself, to pass constitutional muster it must meet the requirements of *Boykin v. Alabama* (1969), 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 that waiver of such a fundamental right cannot be presumed from a silent record. The rule seeks to meet that mandate by its requirement that to trigger waiver the defendant must have "at least fifteen (15) days advance notice of his scheduled trial date *and of the consequences of his failure to demand a trial by jury*." Here the arraignment record discloses no advisement to Casselman that he would waive his right to a jury trial unless he demanded it not later than ten (10) days prior to his scheduled trial date. In the absence of such an advisement there was no valid waiver. *Wilson v. State* (1983), Ind.App., 453 N.E.2d 340; *Suits v. State* (1983), Ind.App., 451 N.E.2d 375.

tion and told Casselman that he was Officer James Wofford of the Elkhart County Sheriff's Department. The identification consisted of a badge and a card bearing Wofford's picture and stating that he was a deputy sheriff for Elkhart County.

Wofford testified at trial that he then explained to Casselman:

"That I had the Body Attachment and that it was from the corporation and that I needed to serve it on him, it was out of Elkhart Division Court, James Rieckhoff was the Judge, and that it was a thousand dollars bond I believe. I also asked him if he owed any money to the company."

Record at 95. Casselman told Wofford of his filing for bankruptcy and asked Wofford to contact Casselman's attorney. Instead, Wofford began to read the text of the writ. At that time, according to Wofford, Casselman "started hollering at me and yelling at me and stating to see his lawyer and to get out of there." Record at 96. When Wofford continued to read, Casselman tried to close the door. Wofford "reached for the door to try to stop him from closing it." Casselman pushed Wofford away but Wofford "grabbed the door again, reached in, stuck [his] left front leg in to try to keep the door open." After a shoving and grabbing match, Casselman retreated into his house. Wofford followed, drew his service revolver, pointed it at Casselman and instructed him to "freeze." Wofford then took Casselman into custody.

Casselman was convicted of resisting law enforcement for his conduct. The statute, IC 35–44–3–3, provides in pertinent part:

"(a) A person who knowingly or intentionally:

(1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer;

(2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court ...

commits resisting law enforcement, a Class A misdemeanor ...." (hereinafter, Section (a)(1) and Section (a)(2) ).

The charging information sufficiently encompassed either a violation of Section (a)(1) or Section (a)(2) of the statute.[2] Our review of the evidence is therefore directed to whether the state proved Casselman knowingly or intentionally forcibly resisted, obstructed or interfered with either "a law enforcement officer ... lawfully engaged in the execution of his duties as an officer" or "the authorized service or execution of a civil or criminal process or order of a court."

At the outset it is important to understand what this case does not involve. The writ of attachment of the body is not a criminal arrest warrant.[3] The form and contents of an arrest warrant are outlined in IC 35–33–2–2. "Arrest is the taking of a person into custody, that he may be held to answer *for a crime*." IC 35–33–1–5 (our emphasis). " 'Crime' means a felony or a misdemeanor." IC 35–41–1–6. Contempt, while punishable by imprisonment, is neither a felony nor a misdemeanor and technically is not a crime as defined in this state. *See Niemeyer v. McCarty* (1943), 221 Ind. 688, 51 N.E.2d 365 (overruled only as to issue not relevant to our case, *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210). Wofford did not serve a criminal arrest warrant on Casselman. He therefore could not claim the right to exercise the powers associated with the service of such a warrant.[4]

2. Although the information does not trace the two sections of the statute completely, Casselman waived any defect by failing to challenge the information in the trial court as required by IC 35–34–1–4. *See Rogers v. State* (1949), 227 Ind. 709, 88 N.E.2d 755.

3. However, there are similarities between the two. As does an arrest warrant, the writ authorizes the sheriff to take a person into custody and provides for bail.

4. On the date Wofford served the writ, IC 35–1–19–6 provided:

Accordingly, we proceed with the understanding that the writ of attachment of the body served by Wofford was an authorization to effect a civil, not a criminal arrest.[5] This distinction is important as we view the confrontation on the doorstep of Casselman's house.

■ Assuming arguendo that the writ was properly issued and that Wofford had a legal right and duty to arrest Casselman, it is still necessary to determine whether Wofford, by forcibly preventing Casselman from closing the door to his home, was "lawfully engaged in the execution of his duties," Section (a)(1) or whether Casselman, by resisting Wofford's efforts, interfered with "the authorized service or execution of a civil ... process or order of a court." Section (1)(2).

"It is remarkable that upon a question of such frequent recurrence in practice, and of so much importance in relation to the service of civil process and the powers and duties of officers therein, no direct judicial authority is to be found." These words which remain applicable today were written by Chief Justice Shaw in *Ilsley v. Nichols* (1831), 29 Mass. (12 Pick.) 269, a case alleging trespass against an officer who broke into the plaintiff's house for the purpose of attaching goods pursuant to a writ. The court found the breaking to be unlawful and the attachment to be therefore invalid.

A case similar to *Ilsley* arose in Indiana later in the nineteenth century. *State ex rel. McPherson v. Beckner* (1892), 132 Ind. 371, 31 N.E. 950 involved an action for trespass against a constable who, having a writ of replevin ordering him to seize a sewing machine possessed by a resident of McPherson's house, "pushed with great force on [the] outer door of [the] dwelling house, and forced [it] open, against the will and power of [McPherson] ...." 31 N.E. at 950. From a judgment for the defend-

ant, the Supreme Court reversed and granted a new trial. The court stated:

"The writ under which the officer was acting was but a civil process, and did not authorize him to force the outer door of a dwelling. 2 Freem. Ex'ns. Section 256; *Snydacker v. Brosse*, 51 Ill. 357; note to *McGee v. Givan*, 4 Blackf. 16; *Curtis v. Hubbard*, 4 Hill. 437. In actions of replevin a sheriff may, under our statute, (Rev.St.1881, 1271.) in some cases, cause a building or inclosure to be broken open, but no similar statute gives such right to a constable. Except as modified by statute, the common-law principle that every man's house is to be treated as his castle, and kept sacred from forcible intrusion, prevails in this state."

31 N.E. at 951. In holding that the constable's conduct amounted to a trespass, the court incorporated the following language from another case, *State v. Armfield*, 2 Hawks 246:

" 'The law is clearly settled that an officer cannot justify the breaking open an outer door or window in order to execute process in a civil suit; if he doth, he is a trespasser. A man's house is deemed his castle, for safety and repose to himself and family; but the protection and pose would be illusive and imperfect if a man were deprived of the right of shutting his own door when he sees an officer approaching to execute civil process. If the officer cannot enter peacefully before the door is shut, he ought not to attempt it, for this unavoidably endangers a breach of the peace, and is as much a violation of the owner's right as if he had broken the door at first.' We regard this case as a correct enunciation of the law applicable to the question under consideration. In our opinion the officer, in forcing an entrance into the dwelling house, was guilty of a tres-

---

"To make an arrest in criminal actions the officer may break open any outer or inner door or window of a dwelling house or any other building or inclosure to execute the warrant, if, after notice of his authority and purpose, he be refused admittance."

Repealed by P.L. 320–1983, Sec. 25. See now IC 35–33–2–3(b).

5. The parties do not argue to the contrary.

pass which rendered his subsequent acts unlawful, and justified the relatrix in resisting his further progress in serving the writ by force. *Curtis v. Hubbard*, 4 Hill, 437."

31 N.E. at 952.[6] *See also* 62 Am.Jur.2d *Process* Section 58 (1962) and Restatement (Second) of Torts, Section 129(b) (1965) (common law recognizes no right to forcibly enter a person's dwelling to execute a writ or other civil process upon that person.)

A variation of this theme appears in *Miller v. U.S.* (1958), 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332. There, the United States Supreme Court held it was unlawful to arrest Miller on criminal charges when the arrest was effected by police officers, without a warrant, breaking and entering Miller's apartment without expressly announcing the purpose of their presence or demanding admission. In outlining the historical perspective for its holding, the Court said:

> "From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:
>
> > " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' "

357 U.S. at 306–07, 78 S.Ct. at 1194–95.

While none of the cases we have cited concern body attachment for contempt, we believe they stand for the proposition that in matters concerning merely civil process, the courts of this land have been zealous in protecting against the authority of government to force entry into a private dwelling.

■ We find that Wofford was not lawfully engaged in the execution of civil process when, while attempting to effect service of the writ, he prevented Casselman from closing the door to his home. *See State v. Armfield, supra* ("If the officer cannot enter peacefully before the door is shut, he ought not to attempt it ....") *Accord,* 62 Am.Jur.2d *Process* Section 64 (1962) ("Although neither the door nor window is closed or locked, an entry is nevertheless without justification if the householder is present, evidencing a desire to exclude the officer by closing his house against him, even after the latter is partly in.") Casselman had the right to close the door; he engaged in no resistance, obstruction or interference other than to attempt to assert that right. The scuffle between Casselman and Wofford arose only after Wofford unlawfully entered Casselman's doorway to prevent Casselman from closing the door.

> "If it is to be held, that all, that is meant by a man's house being his castle, is, that he may defend it, if he can, but that, if he cannot, and is overcome, he is then left as defenceless as he would have been under other circumstances, then the notion about his house being a protection to him is all frittered away and is a mere shadow."

*State v. Hooker* (1845), 17 Vt. 658 (defendant's conviction for resisting law enforce-

---

**6.** The statute referred to in *Beckner* authorizing a sheriff to break an outer door in replevin actions remains in force today as IC 34–1–9.1–10. It, however, is the only statutory authorization we find in Indiana for forcible entry into a home to effect service of *civil* process. *Compare* service of a criminal arrest warrant. *See* n. 4.

ment was reversed and new trial ordered where trial court had erroneously instructed jury that once officer had unlawfully broken into house to serve civil process, occupant had no right to resist).

The state argues that even if the arrest was unlawful, Casselman had no right to resist. As the state suggests, a modern trend has evolved abrogating the common law right to resist, holding

> "... that a private citizen may not use force in resisting a peaceful arrest by an individual who he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful or unlawful."

*Williams v. State* (1974), 160 Ind.App. 294, 311 N.E.2d 619, 621. *See also Fields v. State* (1978), 178 Ind.App. 350, 382 N.E.2d 972.

In *Fields*, the defendant attempted to prevent the police from towing his truck. The police had no legal right to remove the truck nor did they have the right to prevent Fields from doing so. Nonetheless, the police informed Fields he was under arrest for interfering with police officers. Fields struggled with the officers as they attempted to subdue him, hitting one of the officers on the chin. The First District held that Fields' initial arrest for interfering with a police officer was illegal but that nonetheless he was not entitled to forcibly resist the officers' attempt to apprehend him. The court felt that the common-law rule that a person was entitled to resist an unlawful arrest with reasonable force was "outmoded in our modern society." 382 N.E.2d at 975.

In *Williams v. State*, Williams was convicted for interfering with a police officer who arrested him after the officer responded to a call from a tavern where an altercation was taking place. On the arrival of the police at the tavern, the bartender requested that Williams and another be arrested for assault and battery. After being told by the police that he was under arrest, Williams struggled with the officers and gained control of one of their revolvers. He was subdued after firing two shots at the officers. On appeal from his conviction, Williams asserted, *inter alia*, that it was unlawful for the officers to arrest him for a misdemeanor that was not committed in their presence. In affirming, we recognized the common-law right to resist an unlawful arrest but held that, even assuming the arrest to be unlawful, Williams was not justified in using force to resist the arrest. 311 N.E.2d at 621.

We both accept and support the modern trend announced in *Fields* and *Williams*. We find it inapplicable, however, to the facts before us. In those cases where the modern rule has been applied, a citizen resisted what he knew or had reason to know to be an attempt at a peaceable arrest by a person he knew or had reason to know to be a police officer. The arrests occurred in public places and were for criminal offenses.[7] The unlawfulness of the arrests arose from the absence of sufficient grounds for the arrests, not from the means used to effect the arrest. In *Fields* we justified the abrogation of the common law right to resist as follows:

> "A citizen, today, can seek his remedy for a policeman's unwarranted and illegal intrusion into the citizen's private affairs by bringing a civil action in the courts against the police officer and the governmental unit which the officer represents. The common law right of forceful resistance to an unlawful arrest tends to promote violence and increases the chances of someone getting injured or killed."

382 N.E.2d at 975. We added, however, that "Our holding is limited to the fact situation presented in the case at bar." 382 N.E.2d at 976. *Compare Wise v. State* (1980), Ind.App., 401 N.E.2d 65 which applies *Fields* but acknowledges an exception where the officer uses excessive force in attempting the arrest.

---

7. Although the argument is not made, we consider and reject the possible argument that Wofford's entry was to effect the criminal arrest of Casselman under color of authority after Casselman allegedly resisted Wofford's illegal entry to effect the civil arrest.

In the fact situation before us the evidence is susceptible of more than one inference. It nevertheless fairly supports the conclusion that Casselman was aware, or should have been aware, that Officer Wofford was a police officer and that he intended to serve some judicial process from the Elkhart County Court upon Casselman. However, assuming Casselman knew that civil arrest was intended, we do not believe the rule announced in *Fields* and *Williams* was intended as a blanket prohibition so as to criminalize any conduct evincing resistance where the *means used* to effect an arrest are unlawful. Thus, in *Fields* the court was careful to express its own reservations about extending the rule to situations where the officer used excessive force or the accused did not know him to be a police officer. 382 N.E.2d at 976. Similarly, *dicta* in both *State v. Wise, supra,* and *City of Indianapolis v. Ervin* (1980), Ind.App., 405 N.E.2d 55, 63 recognize that a citizen might rightfully resist the use of excessive force by one attempting to make an arrest. We think this exception exists and that it applies, at least by analogy, where the arrest is attempted by means of a forceful and unlawful entry into a citizen's home. In the eyes of the law such an entry represents the use of excessive force.

In the recent Connecticut case of *State v. Gallagher* (1983), 191 Conn. 433, 465 A.2d 323, a police officer went to Gallagher's home to investigate a neighbor's request that the officer arrest Gallagher for certain allegedly unneighborly conduct. The incident between the officer and Gallagher which ensued in Gallagher's home led to Gallagher's conviction for interfering with a police officer. In setting aside Gallagher's conviction the Supreme Court of Connecticut discussed the significance of the home in the context of unlawful arrests:

> "At common law, reasonable resistance to an unlawful arrest was privileged conduct.... Coupling an unlawful arrest with an unlawful entry adds to the seriousness of the governmental intrusion because of the recognized privacy interest that attaches to a private home. In such circumstances, it is reasonable to view the governmental intrusion as especially provocative and a defendant's resistance to entry and arrest as excusable and therefore privileged. Courts therefore have recognized a greater privilege to resist an unlawful entry into private premises than to resist an unlawful arrest in a public place. *See United States v. Ferrone,* 438 F.2d 381, 390, n. 19 (3d Cir.), cert. denied, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971); *State v. Cesero,* 146 Conn. 375, 379, 151 A.2d 338 (1959); *White v. Morris,* 345 So.2d 461, 467 (La.1977); *Pettis v. State,* 209 Miss. 726, 730–31, 48 So.2d 355 (1950); *Masden v. State,* 156 Tex.Cr. 538, 244 S.W.2d 228 (1951); *State v. Hooker,* 17 Vt. 658, 672 (1845); *LaFave, supra,* p. 217; *Chevigny, supra,* 1142.

> In recent years, state legislation has tended to abrogate the right to resist an unlawful arrest. E.g., Cal.Penal Code Section 843 (West Supp.1968); Fla.Stat. Ann. Section 776.–051(1) (West 1976); Tex.Penal Code Ann. Section 38.03(a), (b); see discussion in *State v. Thomas,* 262 N.W.2d 607, 610–11 (Iowa 1978). Thus, in *State v. Concaugh,* 170 Conn. 95, 99, 365 A.2d 395 (1976), we observed that General Statutes Section 53a–23; see text, *supra;* 'can only be read as abrogating the commonlaw rule established in this state in cases such as *State v. Amara,* 152 Conn. 296, 299, 206 A.2d 438 [1964] and *State v. Engle,* 115 Conn. 638, 648, 162 A. 922 [1932], that a person may resist an illegal arrest.' *Id.*

> Neither General Statutes Section 53a–23 nor *State v. Concaugh* purport, however, to abrogate the privilege to resist an unlawful entry. Nor can our statute be said to have repealed the privilege by implication, in light of the requirement of strict construction of penal statutes which are in derogation of the common law."

465 A.2d at 327 (some citations omitted). The *Gallagher* court then cited cases from jurisdictions where the courts instead of the legislature had abrogated the right to

resist. After outlining the arguments supporting those cases, the court continued:

"We recognize that these arguments apply in some measure to resistance to an unlawful entry. While they reinforce the policy that private resistance to governmental action is to be discouraged, they cannot totally negate the contrary rule. We will continue to adhere to the common law view that there are circumstances where unlawful warrantless intrusion into the home creates a privilege to resist, and that punishment of such resistance is therefore improper.

\*    \*    \*    \*    \*    \*

The United States Supreme Court's 1980 decision in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), exemplifies the sharp distinction drawn by modern fourth amendment jurisprudence between the relative intrusiveness of arrests effected in the street and those occurring in the home. *Id.*, 587, 100 S.Ct. at 1380. The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' *Id.*, 585, 100 S.Ct. at 1379, quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). We do not suggest that *Payton* recognizes a constitutional right to resist unlawful warrantless entry. Rather, we infer from *Payton* the continuing vitality of that expectation of privacy in the home which underlies the common law right, because the more patently unlawful the intrusion, the more excusable the resistance becomes. Accordingly, at least with respect to entries made without color of warrant, we have refused to abrogate the common law privilege to offer reasonable resistance, not rising to the level of an assault, to an unlawful entry. *See State v. Cesero*, 146 Conn. 375, 379, 151 A.2d 338 (1959); *State v. Anonymous* (1977–5), 34 Conn.Sup. 531, 545–47, 375 A.2d 417 (1977)."

465 A.2d at 328 (some citations omitted). The *Gallagher* court ordered the trial court to retry Gallagher instructing the jury on the defense of reasonable resistance to an unlawful entry.

Although Gallagher's arrest was unlawful due to the absence of an arrest warrant or exigent circumstances to justify the entry into Gallagher's home, circumstances distinguishable from ours, we draw the same line as did the Connecticut court. That line extends across the doorway of Casselman's house and separates his situation from that of Fields and Williams who knowingly resisted arrests in public places. The common law right to resist such arrests has been abrogated; the right to offer reasonable resistance to an unlawful entry has not.

The modern trend itself supports this conclusion based as it is on the premise that the attempted arrest is a peaceful one. The justification for stripping a citizen of his right to resist a peaceful arrest lies significantly in a policy of preventing the escalation of violence once resistance is first offered. *Fields, supra.* However, without the initial peacefulness of the arrest, a large part of the justification for requiring the arrestee's submission is lost. In the absence of a criminal arrest warrant, an arrest cannot be considered peaceful when it is accomplished by forcibly preventing a person from closing the door to his house or by entering the house without permission.

■ A question remains as to whether Casselman's actions, although not violative of Section (a)(1) of the statute as it is addressed to Wofford's lawful authority, are violative of Section (a)(2) which criminalizes resistance to the authorized service of process. We think the evidence does not support a conviction under the latter section.

If the term "authorized" is intended to express the lawful manner of service, Wofford's actions were unauthorized as discussed above. If the term is meant to describe the fact that the service of process had been approved by a judicial officer, we

reach the same result.[8] The court did authorize Wofford to arrest Casselman pursuant to the writ. However, the extent of that authority is necessarily limited.

"[T]he writ affords him a definite and limited authority only, regulated by law; and the legal justification of his acts is coextensive with his legal authority, and he has no protection when acting beyond the scope of that authority. The authority is given upon this restriction and condition, that it shall not be abused or exceeded, or colorably used to effect an unlawful purpose. To accomplish this the rule is well established, that where an authority given by law is exceeded, the party loses the benefit of his justification, and the law holds him a trespasser *ab initio*, although to a certain extent he followed the authority given."

*Ilsley v. Nichols* (1831), 29 Mass. (12 Pick.) 269, 276.

Just as the judicial authorization of the writ does not give an officer the right to use excessive force in effecting an arrest, it does not give the officer the right to interfere unlawfully with a citizen's right to be secure in his home. *Compare* IC 35–33–2–3 regarding criminal arrest warrants.

The modern rule followed in *Fields* and *Williams* is not applicable here. We conclude that Casselman did not resist law enforcement as meant by IC 35–44–3–3 on the facts presented to the trial court. Accordingly we reverse and remand for vacation of Casselman's conviction and for entry of judgment of acquittal.

STATON, P.J., concurs.

HOFFMAN, J., dissents and files separate opinion.

HOFFMAN, Judge, dissenting.

I respectfully dissent. Appellant Casselman was charged and convicted of resisting a law enforcement officer pursuant to IND.CODE § 35–44–3–3, sections (a)(1) and (a)(2). Those sections appear as follows:

"Sec. 3. (a) A person who knowingly or intentionally:

(1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer;

(2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court;

\* \* \* \* \* \*

commits resisting law enforcement, a Class A misdemeanor."

The process that was served by Officer Wofford upon Casselman is civil in nature.[1] As such, the manner of service must comply with the provisions of IND.CODE § 34–1–6–1 through 14, respecting civil arrests.[2] If the arrest order appears to have been properly procured and is valid on its face, the officer ordered to serve it may act in reliance upon it. *Stine v. Shuttle et al.* (1962), 134 Ind.App. 67, 186 N.E.2d 168.

The law enforcement officer in *Stine* was sued by a citizen falsely arrested for non-payment of a traffic fine. The Court therein stated:

"It is ... a general rule of law that a process or warrant not void on its face issued by a tribunal having general jurisdiction of the subject matter is a protection to the officer executing it, and the officer is not required to look beyond the process or warrant or determine the va-

---

**8.** Ill.Ann.Stat. ch. 38, Section 31–3 (1961) is substantially similar to our Section (a)(2). In the Committee Comments to that statute, revised in 1970 by Charles H. Bowman, the comment is made that "Under section 31–1 (similar to our Section (a)(1)) it is the authority of the duly appointed peace officer which must not be flouted or obstructed; in section 31–3 it is the authority of the judiciary represented by its judicial process which must not be obstructed.

**1.** IND.CODE § 34–4–11–4, IND.CODE § 34–1–41–10.

**2.** Those sections require that an order for arrest be made by the court or its clerk upon the affidavit of the plaintiff. The arrest order is thereafter delivered to and executed by the sheriff.

lidity or regularity of the proceedings on which it is founded, or to exercise his judgment touching its validity in a point of law .... Even though a process may have been issued irregularly by a party who might be liable, it is nevertheless a protection to the officer executing it. See Vol. 35, C.J.S., pp. 539–540. It is only where a process is void on its face that the arresting officer is not protected. Vol. 35, C.J.S., p. 541." 134 Ind. App. at 74, 186 N.E.2d at 172.

The writ of attachment herein was issued by the Elkhart County Court after Casselman twice failed to appear for proceedings supplemental to a judgment entered against him. The arrest order commanded Casselman to appear before the court and show cause why he should not be held in contempt for failing to appear at the two prior hearings. The court issuing the arrest order was wholly without notice of a pending bankruptcy proceeding involving Casselman.

By executing the writ, as directed, Wofford was properly fulfilling his official duties, acting upon an arrest order valid on its face. Law enforcement officers must not be required to discern and decide all issues of law before attempting to serve an arrest order which in all respects appears to be valid. Casselman makes no showing that the process issued was improperly obtained or invalid on its face and admits that the issuing court was given no notice of the bankruptcy proceeding until after the writ was executed. To allow a debtor to assert bankruptcy each time a process server attempts service of a civil process would significantly undermine the purpose of proceedings supplemental.

The majority herein seeks to preserve the common-law right of a citizen to resist an unlawful arrest and likewise concludes that the arrest of Casselman was unlawful. The statute in question here was enacted to enable law enforcement officers to carry out their official duties in a safe and orderly manner. The result reached by the majority would allow citizens to avoid civil arrest merely by closing the door to their homes. To allow a citizen to resist any form of civil arrest in this way would effectively eliminate all such arrests.

It is clear that the use of excessive or unnecessary force by an arresting officer making a civil arrest cannot be justified. *City of Indianapolis v. Ervin* (1980), Ind. App., 405 N.E.2d 55. However, the actions of Officer Wofford in making the arrest herein were not at all improper. Wofford was acting upon an arrest order proper in all appearances. Casselman was fully informed of Wofford's official status and purpose. When the reading of the writ was interrupted, Wofford asked that Casselman allow him to complete the reading of the writ and they would then discuss the matter. Casselman responded by yelling at Wofford and proceeding to close the door. As Wofford reached forward to hold the door open, he was pushed backward. It was after Casselman had physically pushed Wofford away from the door that Wofford was compelled to react with force. In order to detain and subdue Casselman, Wofford was ultimately forced to enter Casselman's home and draw his service revolver.

The "resisting" prohibited by statute occurred while Wofford was outside the Casselman residence, before any force whatsoever was exhibited by Wofford. The actions thereafter taken by Wofford were in no way unnecessary or excessive but were a reasonable response to Casselman's resisting the arrest.

Recent cases have held that a citizen may not use force in resisting a peaceful arrest by a person who he knows or has reason to know is a police officer performing his duties, regardless of whether the arrest is lawful or unlawful.

> *City of Indianapolis v. Ervin, supra;*
> *Fields v. State* (1978), 178 Ind.App. 350, 382 N.E.2d 972;
> *Williams v. State* (1974), 160 Ind.App. 294, 311 N.E.2d 619.

As the *Fields* Court recognizes, the common-law right of forceful resistance to unlawful arrests serves only to promote violence. That right is outmoded in modern

society. *Fields, supra,* 382 N.E.2d at 975. Quoting *Miller v. State* (1969), Alaska, 462 P.2d 421, at 426–427, the *Fields* Court states:

" 'We feel that the legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the officer and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders. The old common law rule has little utility to recommend it under our conditions of life today.' "

---

**3.** *See,* IND.CODE § 34–4–11–3.

*Fields, supra,* 178 Ind.App. at 356–357, 382 N.E.2d at 976.

If the issuance of the arrest order herein was in any way improper, Casselman's remedy should not lie at the scene of confrontation but should instead be determined in a court of law.[3] The evidence presented is sufficient to support Casselman's conviction for resisting a law enforcement officer under sections (a)(1) and (a)(2) of IND.CODE § 35–44–3–3. His conviction should be affirmed.