**Nicholas D. BAIRD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 62A04–0512–CR–720.**

Court of Appeals of Indiana.

Sept. 26, 2006.

Transfer Denied Nov. 14, 2006.

Chistopher M. Goffinet, Jeffrey W. Hagedorn, Huber & Goffinet, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

KIRSCH, Chief Judge.

Nicholas D. Baird appeals his convictions for dealing in a narcotic drug[1] as a Class A felony, possession of methamphetamine[2] as a Class C felony, possession of a single precursor[3] as a Class D felony, illegal possession of anhydrous ammonia or ammonia solution[4] as a Class D felony, possession of chemical reagents or precursors with intent to manufacture[5] as a Class D felony, and maintaining a common

---

1. *See* IC 35–48–4–1(a)(1)(A).

2. *See* IC 35–48–4–6(a).

3. *See* IC 35–48–4–14.5(b).

4. *See* IC 35–48–4–14.5(c).

5. *See* IC 35–48–4–14.5(e).

nuisance,[6] a Class D felony. On appeal, he raises the following restated issues:

I. Whether the trial court erred in admitting evidence of illegal drug activity obtained during a warrantless search.

II. Whether the trial court's delay in providing Baird the jury list pursuant to IC 33–28–4–9 was done in bad faith or was harmful to Baird's substantial rights.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Around 7:00 p.m. on December 7, 2004, Thomas Hauser, who lived in a relatively woody and rural part of Perry County, Indiana, was standing on his front porch when he saw an explosion in the woods across the road. The location of the explosion was later determined to be on property located at 8175 N. State Road 66, which was owned by Cynthia Cambron. Hauser telephoned central dispatch of the Tell City Police Department, provided his name, reported that he had seen an explosion across the road, explained that there had been suspicious activity on the property, and asked that an officer be sent to check it out. Hauser also requested that his name be kept off the police radio noting, "they listen to the scanner and I don't want any trouble with these people up here." *Def.'s Ex. M* at 2.

Dispatch contacted Richard Kratzer, a Deputy Sheriff for Perry County, requesting assistance to check out the explosion. Deputy Kratzer questioned, "Do I have the right to go on the property?" to which dispatch responded, "Okay, as a welfare check, he saw, I mean I need to send somebody. He saw an explosion." *Id.* at 4. Deputy Kratzer acceded and asked for

back up from the State Police. In response, dispatch contacted the State Police in Jasper who agreed to send Trooper Jeffrey Smith to investigate the explosion. Dispatch also enlisted Conservation Officer Phil Schuetter to assist in finding the location of the property.

Finally, dispatch contacted Jeff Bender, a senior police officer with the Tell City Police Department to inquire whether the fire department should be sent. Officer Bender confirmed with dispatch her understanding that the property in question was not a residence, was not occupied, and that Hauser did not see any flames at the time of his call. Based on this information, Officer Bender agreed that the best course of action was to delay sending the volunteer fire department and, instead, send the officers.

About forty-five minutes after the call, the three officers converged on the scene to find a locked gate blocking the driveway to the property. Initially, the officers could not see fire but could smell that something had been burning. While the officers stood at the end of the driveway in the foggy, damp air discussing their next move, Trooper Smith heard a noise that drew his attention skyward. *Tr.* at 333. Officer Schuetter also testified that he heard a "swoosh or that type of noise of a fire." *Id.* at 516. While the hilly terrain and darkness somewhat obscured the property, Trooper Smith and Officer Schuetter noted the flicker of firelight reflecting on the top of the bare trees. This evidence supported the report of an explosion and subsequent fire, and renewed Trooper Smith's concern of the need to investigate "to see if anybody was hurt or what was going on." *Id.* at 333, 335.

The officers climbed up the steep hill directly toward the location of the fire.

6. *See* IC 35–48–4–13(b)(2).

*Id.* at 477. At the top of the hill, the officers saw an unlit building in the open and the glow of fire behind it. The officers were initially unable to determine the nature of the building and whether it was on fire. Officer Schuetter went to the left of the building, turned on his flashlight, and found himself on the edge of a pull-around type driveway leading up to a house. The officers then saw Baird wearing a "some type of light on his head" and standing by what appeared to be an active lab for manufacturing methamphetamine. *Id.* at 337–39. Around the same time, Trooper Smith observed Cambron leave an active burn pile and approach the house wearing rubber gloves. *Id.* at 342, 407.

The officers handcuffed both Cambron and Baird and placed them under arrest. When questioned, both suspects confirmed that no one else was on the property. Officer Schuetter and Trooper Smith performed a protective sweep of the home. Thereafter, the officers advised the suspects of their *Miranda* rights. Each suspect then signed a consent to search form ("Consent"), which waived the right to have an attorney present. Cambron's Consent stated that the officers were authorized to make a warrantless search of her house, her garage, and vehicles on her property. *State's Trial Ex.* 2. Baird's Consent stated that the officers were authorized to make a warrantless search of his black 2000 Chevy truck located in Cambron's garage. *State's Trial Ex.* 3. Each Consent stated that no pressure or coercion had been exerted to obtain the Consent.

Upon entering the home, the officers noted that the walls were not finished, the home was unfurnished, and the house contained no appliances or food. During the search, the officers found methamphetamine, several pounds of pseudoephedrine tablets, lithium batteries, jars, a hot plate, and drug paraphernalia. A tank of anhydrous ammonia was recovered from a ditch near the driveway. In Baird's truck, the officers found bags of a powdery substance containing methamphetamine, a smoking pipe, a .45 caliber handgun, and a high-powered rifle.

The State charged Baird with dealing in a narcotic, possession of methamphetamine, possession of a single precursor, illegal possession of anhydrous ammonia, possession of chemical reagents or precursors with intent to manufacture, and maintaining a common nuisance. Prior to trial, Baird moved to suppress the evidence obtained during the warrantless search claiming there was no probable cause for the residence, yard, or vehicle to be searched, and that the seized property was the direct result of an illegal search.

Following two evidentiary hearings on the motion to suppress, the trial court denied the motion and found that, under the circumstances, the officers had acted reasonably and that there was no showing that Baird's consent was "anything but knowingly and voluntarily given." *Tr.* at 246. On September 6, 2005, at the close of the second motion to suppress hearing, Baird's counsel requested that the trial court supply the jury list a week before the start of trial. *Id.* at 244. The trial court stated that it would provide the list as soon as possible but noted, "You are running into the particular situation of your trial is the first one of a new quarter. So, that means we have a whole new panel, which also means we should have plenty of jurors for both cases. . . ." *Id.* The trial court provided Baird with a jury list at 8:45 on the morning of trial. With forty-six juror questionnaires to review, defense counsel objected to being given the list just fifteen minutes prior to trial. Without comment, the trial court overruled Baird's objection.

During trial, Baird renewed his motion to suppress the evidence and asked the court to show a continuing objection. Following the State's presentation of the evidence, defense counsel renewed his objection and argued specific case law to the court. The trial court again denied Baird's motion finding that he lacked standing to challenge the officer's entry onto the property and that the officers acted reasonably when they investigated the reported explosion and possible fire. Baird was convicted of all counts, and he now appeals.

## DISCUSSION AND DECISION

■ Baird contends that the trial court erred in denying his motion to suppress evidence of drug activity obtained during a warrantless search. We note, however, that Baird did not file an interlocutory appeal. Instead, he proceeded to trial and objected to the admission of the same evidence. Once a case proceeds to trial, the question of whether the trial court erred in denying a motion to suppress is no longer viable. *Cochran v. State*, 843 N.E.2d 980, 983 (Ind.Ct.App.2006), *trans. denied; Kelley v. State*, 825 N.E.2d 420, 424 (Ind.Ct. App.2005). "A ruling upon a pretrial motion to suppress is not intended to serve as the final determination of admissibility because it was subject to modification at trial." *Cochran*, 843 N.E.2d at 983. On appeal, Baird's only available argument is whether the trial court erred in admitting the evidence at trial. *Id.; Kelley*, 825 N.E.2d at 425.

We reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Kelley*, 825 N.E.2d at 424. An abuse of discretion may occur if a decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Regarding the "abuse of discretion" standard generally, our Supreme Court has observed, "to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result." *Pruitt v. State*, 834 N.E.2d 90, 104 (Ind. 2005), *cert. denied,* — U.S. ——, 126 S.Ct. 2936, — L.Ed.2d —— (2006).

## I. Warrantless Search of the Property

Baird contends that evidence seized from the property should be suppressed because the search of the property, including the truck, was a violation of his rights under the Fourth Amendment to the United States Constitution, and Article 1, section 11, of the Indiana Constitution. He argues that the trial court erred by admitting this evidence at trial.[7]

### A. Fourth Amendment Protections

■ The Fourth Amendment protects persons from unreasonable search and seizure, and this protection has been extended to the states through the Fourteenth Amendment. *Krise v. State*, 746 N.E.2d 957, 961 (Ind.2001); *Buckley v. State*, 797 N.E.2d 845, 848 (Ind.Ct.App.2003). The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Lundquist v. State*, 834 N.E.2d 1061, 1067 (Ind.Ct.App.2005); *Van Winkle v. State*, 764 N.E.2d 258, 263 (Ind.Ct.App. 2002), *trans. denied.* Warrantless searches and seizures inside the home are presumptively unreasonable. *Buckley*, 797

---

7. During trial, the State argued that Baird did not have standing to challenge the search because he did not own the property, nor was he an overnight guest of Cambron. The trial court agreed that Baird did not have standing, yet noted that lack of standing was only one basis for its denial of the motion to suppress. We therefore assume without deciding that Baird had standing and proceed to the issue of whether the search was constitutional.

N.E.2d at 848–49. " 'An individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the home's curtilage—the area immediately surrounding the home.' " *Shultz v. State,* 742 N.E.2d 961, 964 (Ind.Ct.App. 2001), *trans. denied.* The protection afforded curtilage is justified on the basis of needing family and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most high. *Rook v. State,* 679 N.E.2d 997, 999–1000 (Ind.Ct. App.1997). That being said, the mere fact that a legitimate police investigation allows items within the curtilage to be seen does not automatically transform a warrantless observation or inspection into an unconstitutional search. *Trimble v. State,* 842 N.E.2d 798, 801 (Ind.2006).

 There are limited exceptions to the warrant requirement under the Fourth Amendment. *Collins v. State,* 822 N.E.2d 214, 218 (Ind.Ct.App.2005), *trans. denied; see Smock v. State,* 766 N.E.2d 401, 404 (Ind.Ct.App.2002). A well-recognized exception to the warrant requirement is when exigent circumstances exist. *Collins,* 822 N.E.2d at 218. Under this exception, police officers may enter a residence or curtilage if the situation suggests a reasonable belief of risk of bodily harm or death, a person in need of assistance, a need to protect private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained. *Scott v. State,* 803 N.E.2d 1231, 1235–36 (Ind.Ct.App.2004); *Harless v. State,* 577 N.E.2d 245, 248 (Ind.Ct.App. 1991).

 A valid consent to search is likewise an exception to the warrant requirement. *Best v. State,* 821 N.E.2d 419, 429 (Ind.Ct.App.2005), *trans. denied.* The theory underlying the consent exception is that, when an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable. *Primus v. State,* 813 N.E.2d 370, 374 (Ind.Ct.App.2004); *Pinkney v. State,* 742 N.E.2d 956, 959 (Ind.Ct.App.2001), *trans. denied.* A consent to search is valid except where procured by fraud, duress, fear, or intimidation or where it is merely a submission to the supremacy of the law. *Joyner v. State,* 736 N.E.2d 232, 242 (Ind.2000).

 The State bears the burden of proving that an exception to the warrant requirement exists when a warrantless search is conducted. *Collins,* 822 N.E.2d at 218. The trial court considered the evidence presented at trial. Here, officers were responding to an identified citizen's concern of an explosion. They approached the scene of the fire and, while aware that criminal activity could be afoot, were unsure if they were responding to a risk of bodily harm or protection of private property. Being unable to drive up past the locked gate, the officers took the most direct route to the fire. This brought them across a wooded hillside from which no building was visible. The trial court noted that the intrusion was in fact just an intrusion onto the hillside and outer yard. The trial court found the privacy interest in the hillside was minimal and that the intrusion was reasonable.

Being properly on the property, the officers were allowed to keep their eyes open; it was from this vantage point that the officers noted Baird inside the curtilage, wearing a light on his head, and attending to a methamphetamine lab on an outside wall. Furthermore, much of the evidence admitted at trial was obtained pursuant to a search done in compliance with a written consent from each of Cambron and Baird, which stated that they had been advised of their rights and had not been coerced into signing the consent. The trial court's decision that this warrantless search did not violate Baird's Fourth Amendment rights

was not against the logic and effect of the facts before it.

### B. The Claim under the Indiana Constitution

 Article I, Section 11 of the Indiana Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"Although this language tracks the Fourth Amendment verbatim, we proceed somewhat differently when analyzing the language under the Indiana Constitution than when considering the same language under the Federal Constitution." *Trimble,* 842 N.E.2d at 803. Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, concluding that the search is legitimate where it is reasonable given the totality of the circumstances. *Id.* To assess reasonableness, we consider: " '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.' " *Trimble,* 842 N.E.2d at 803 (quoting *Litchfield v. State,* 824 N.E.2d 356, 361 (Ind.2005)).

 Here, Hauser did not call police dispatch as an anonymous informant to report suspicious activity or the existence of a possible methamphetamine lab; instead, he called to report having seen an explosion and a fire in the woods across the road. When officers arrived forty-five minutes later, a burning smell confirmed Hauser's report. Although the officers initially saw no sign of fire, the unexpected "swoosh" sound like an accelerant on a fire

and the emergence of firelight on the trees signaled that the fire was not out and that future danger was possible. The trial court found that the uncertainty and the nature of the situation warranted investigation. The trial court was convinced of this especially in light of the fact that the weather, which was inhospitable to fire, did not appear to be controlling or extinguishing the fire. Recognizing that the officers' testimony contained minor inconsistencies, the trial court concluded that those inconsistencies did not undermine the court's confidence in the officers' greater credibility that they were on site to attend to the issue of the fire. The trial court found the search was reasonable given the totality of the circumstances. It also found no evidence that the executed consents were not voluntarily signed. The trial court's decision that this warrantless search did not violate Baird's rights under the Indiana Constitution was not against the logic and effect of the facts before it.

### II. The Jury List

 Baird contends that the trial court erred by providing him with a jury list just fifteen minutes before trial. IC 33–28–4–9(b), in pertinent part, provides, "the jurors called to service shall be identified long enough before the trial or grand jury session to permit counsel to study their backgrounds." At the close of Baird's September 6, 2005 motion to suppress hearing, his counsel asked the court to provide a jury list in sufficient time to investigate the backgrounds of potential jurors. *Tr.* at 244. The trial court explained that preparation of the list would be impacted by Baird's trial being the first one of the new quarter, but promised that the list would be provided as soon as possible. *Id.* The list was not provided until October 3, 2005—the morning of trial. *Id.* at 280. Baird objected to the lateness of the list, but the trial court overruled the objection, and proceeded with voir dire.

We agree that it was error for the trial court to provide the list just fifteen minutes before trial. While cautioning trial judges that the production of timely jury lists is mandated, under the facts of this case, we cannot grant Baird the relief he seeks. IC 33–28–4–9(e), in pertinent part, provides:

> This section ... shall be construed liberally, to the effect that no indictment shall be quashed, and no trial, judgment, order, or proceeding shall be reversed or held invalid on the ground that the terms of this section have not been followed, unless it appears that the noncompliance was either in bad faith or was objected to promptly upon discovery and was probably harmful to the substantive rights of the objecting party.

There is no evidence in the record before us, nor does Baird contend, that the trial court acted in bad faith. Furthermore, while alleging that the delay was "highly prejudicial," Baird does not explain why. *Tr.* at 279. The State presented evidence that police caught Baird and Cambron in the act of cooking methamphetamine, that after being advised of their Miranda rights Baird and Cambron each signed a Consent to search, and that the evidence submitted at trial was found pursuant to those Consents. During voir dire, counsel had the same opportunity to interview the jurors and determine their attitudes towards drugs in general and methamphetamine in particular. Based on the evidence presented to the jury, we do not find that the trial court's delay in producing the list was harmful to Baird's substantial rights.

Affirmed.

SHARPNACK, J., and MATHIAS, J., concur.