

**FILED**

Aug 03 2018, 7:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William P. Stickrod,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 3, 2018<br><br>Court of Appeals Case No.<br>79A04-1710-CR-2473<br><br>Appeal from the Tippecanoe<br>Circuit Court<br><br>The Honorable Thomas H. Busch,<br>Judge<br><br>Trial Court Cause No.<br>79C01-1612-F5-167 |

**Barteau, Senior Judge.**

# Statement of the Case

William P. Stickrod appeals his convictions of possession of methamphetamine, a Level 5 felony;[1] and possession of paraphernalia, a Class C misdemeanor.[2] We affirm in part, reverse in part, and remand with instructions.

# Issues

Stickrod raises three issues, which we restate as:

I.      Whether the trial court erred in admitting evidence the police found in Stickrod's house while serving two arrest warrants.

II.     Whether the trial court violated Stickrod's right to present evidence in his defense by barring a witness's testimony.

III.    Whether Stickrod's two convictions for possession of methamphetamine violate the federal constitutional prohibition of double jeopardy.

# Facts and Procedural History

At 6:50 p.m. on December 17, 2016, Officer Grant Leroux of the Lafayette Police Department and other officers arrived at a house in Lafayette, Indiana. The house belonged to Stickrod's mother, but Officer Leroux knew that Stickrod lived there. The officers were there to execute warrants to arrest Stickrod for failing to appear at court hearings in two criminal cases.

---

[1] Ind. Code § 35-48-4-6.1 (2014).

[2] Ind. Code § 35-48-4-8.3 (2015).

[4] We discuss the circumstances in more detail below, but in summary Stickrod's girlfriend, Jessica Caliz,[3] eventually answered the door and told Officer Leroux that Stickrod was not at home. The officers heard a "thud" coming from the house's attached garage. Caliz had previously lied to Officer Leroux about Stickrod's whereabouts. In addition, Officer Leroux had arrested Stickrod at that house a few weeks prior to December 17, 2016, after finding Stickrod hiding in the garage. The officers entered the house and discovered Stickrod hiding in the garage once again. They handcuffed him and, during a search of his person, discovered a glasses case in a pants pocket. The case contained a glass pipe and a small plastic bag which in turn contained a white powdery substance. Subsequent testing revealed the presence of .8 grams of methamphetamine in the bag and methamphetamine residue on the pipe.

[5] The State charged Stickrod with possession of methamphetamine, a Level 6 felony; possession of paraphernalia, a Class C misdemeanor; and possession of methamphetamine, a Level 5 felony. The State further alleged that Stickrod was an habitual offender. Stickrod filed a motion to suppress all evidence that the State obtained after entering his home. The trial court held a hearing and denied the motion.

[6] The court bifurcated the case, choosing to first submit the Level 6 felony and Class C misdemeanor charges to a jury. After the State rested, Stickrod's

---

[3] Caliz's name is spelled several different ways in the record. We use the spelling set forth in the presentence investigation report.

attorney informed the court outside the presence of the jury that he would not present testimony by Caliz because he believed Caliz would commit perjury on the stand. Stickrod disagreed with his attorney's decision and told the court that Caliz's testimony was "imperative for [his] defense." Tr. Vol. 2, p. 156. Stickrod further asked the court to fire his attorney. The court denied Stickrod's request to fire his attorney and did not allow Caliz to testify.

[7] The jury determined Stickrod was guilty of the Level 6 felony and the Class C misdemeanor, and the court entered a judgment of conviction. Stickrod waived his right to a jury trial on the Level 5 felony and the habitual offender sentencing enhancement. During the second phase of trial, Stickrod pleaded guilty to the Level 5 felony and to being an habitual offender.

[8] At sentencing, the court dismissed the habitual offender enhancement and imposed a sentence on the Level 6 felony, the Level 5 felony, and the Class C misdemeanor. The court further held the Level 6 felony would merge with the Level 5 felony. This appeal followed.

# Discussion and Decision

## I. Admission of Evidence

[9] Stickrod argues the trial court should have granted his motion to suppress. Once a case proceeds to trial, the question of whether the trial court erred in denying a motion to suppress is no longer viable. *Baird v. State*, 854 N.E.2d 398, 403 (Ind. Ct. App. 2006), *trans. denied*. Instead, we review whether the trial court erred in admitting the evidence at trial. *Id.*

[10]     In general, rulings on the admissibility of evidence are reviewed for an abuse of discretion and reversed when admission is clearly against the logic and effect of the facts and circumstances. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017). When a challenge to such a ruling is based on the constitutionality of the search or seizure of evidence, it raises a question of law that we review de novo. *Id.*

[11]     Stickrod argues the officers' entry into his home violated his Fourth Amendment protection against unreasonable search and seizure. He does not present a claim under the Indiana Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The protections of the Fourth Amendment have been extended to the states through the Fourteenth Amendment. *Ratliff v. State*, 770 N.E.2d 807, 809 (Ind. 2002).

[12]     In *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), the United States Supreme Court addressed the circumstances under which an officer may enter a person's dwelling to make an arrest. The Court noted that searches and seizures without a warrant are presumptively unreasonable, and "absent exigent circumstances," officers may not enter a dwelling without a warrant. *Id.* at 590, 100 S. Ct. at 1382. By contrast, for purposes of the Fourth

Amendment, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603, 100 S. Ct. at 1388. An Indiana statute provides that an officer who is serving an arrest warrant "may break open any outer or inner door or window in order to execute an arrest warrant, if the officer is not admitted following an announcement of the officer's authority and purpose." Ind. Code § 35-33-2-3 (2011).

[13] In *Duran v. State*, 930 N.E.2d 10 (Ind. 2010), officers attempted to execute a warrant to arrest Hernandez, but they mistakenly entered Duran's apartment rather than Hernandez's apartment. Once inside, they saw evidence of a drug dealing operation and arrested Duran. Duran claimed the officers' entry violated his Fourth Amendment rights. The Indiana Supreme Court determined that, pursuant to the holding in *Payton*, officers must have a reasonable belief that the dwelling is the residence of the subject of the warrant and that the subject is present at the time the officers attempt to enter on authority of an arrest warrant. The officers' belief that Hernandez was in Duran's apartment was unreasonable because their belief was based entirely on statements by an anonymous man outside the building who may not have had any connection to the building. The officers' entry violated Duran's Fourth Amendment protections.

[14] By contrast, in *Carpenter v. State*, 974 N.E.2d 569 (Ind. Ct. App. 2012), *trans. denied*, an officer arrived at Carpenter's house with an arrest warrant for Howard. Another officer had told the first officer that Howard lived at that

address, but Howard had not lived there for several years. When the arresting officer and his colleagues approached Carpenter's house, there were cars in the driveway and lights were on. An officer looked in a window and saw Carpenter placing items in a toilet. Items used to manufacture methamphetamine were also visible. The officers obtained a search warrant and arrested Carpenter.

[15] Carpenter claimed the officers had no reason to approach his house because Howard was not present. A panel of this Court concluded the information the first officer received from another officer, plus the presence of cars in the driveway and lights on in the house, provided a reasonable belief that the house was Howard's residence and that he was home. The officers did not violate Carpenter's Fourth Amendment rights by approaching the house and looking in the window.

[16] In Stickrod's case, Officer Leroux and several other officers arrived at a house in Lafayette, Indiana on the evening of December 17, 2016. Stickrod's mother owned the house, but Officer Leroux knew Stickrod lived there because he had arrested Stickrod at that address a few weeks prior to the incident at issue. Officer Leroux was there to execute warrants that had been issued by a magistrate in two probation revocation cases. One case involved misdemeanor charges and the other involved a felony and several misdemeanors. Both warrants commanded officers to arrest Stickrod for failure to appear in court and to hold him without bond.

[17] A light was on in Stickrod's bedroom. Officer Leroux knew which bedroom Stickrod used because, during the last time he arrested Stickrod, Stickrod's mother had allowed Officer Leroux to enter the house and had shown him the room in which Stickrod slept. Officer Leroux knocked on the door repeatedly, but no one answered. He asked dispatch operators to call the home's number, and eventually Caliz answered the door. Caliz said that Stickrod was not home, but she had previously lied to Officer Leroux about Stickrod's whereabouts. As they talked, Officer Leroux heard a "thud" coming from the attached garage. Tr. Vol. 2, p. 147. During the prior arrest, Leroux had found Stickrod hiding in the attic of the house's garage.

[18] Caliz agreed to allow the officers to enter the house, but the officers hesitated because they did not believe her consent was valid. Officer Leroux called a prosecutor to ask for a search warrant, but the prosecutor advised that a warrant was unnecessary. Several officers entered the house and found Stickrod hiding in a gun safe in the garage. The officers discovered contraband on Stickrod's person during a search incident to arrest.

[19] We conclude the facts of this case more closely resemble the circumstances of *Carpenter* than the facts of *Duran*. Officer Leroux's visit to the house only a few weeks prior to the incident at issue provided ample reason to believe that Stickrod lived there. In addition, based on Officer Leroux's observations on the evening of December 17, 2016, he had ample reason to believe that Stickrod was present in that house on that night.

[20] Stickrod argues the officers lacked the authority to enter the house because the warrants were not true arrest warrants. He compares the warrants to the writ that was at issue in *Casselman v. State*, 472 N.E.2d 1310 (Ind. Ct. App. 1985). In that case, Casselman was a defendant in a civil lawsuit brought by a creditor. He twice failed to appear for court hearings, believing that he did not need to attend because he had filed for bankruptcy and an automatic stay was in effect. No one had informed the court in the civil case about the stay, and after Casselman twice failed to appear the court issued a writ of attachment, ordering the sheriff to take him into custody.

[21] An officer arrived at Casselman's house. Casselman answered the door, and the officer told him he had a body attachment "from the corporation" and that Casselman needed to come with him. *Id.* at 1312. The officer further stated Casselman could pay a "thousand dollars bond." *Id.* Casselman refused to go with the officer and retreated into his house. The officer followed Casselman into the house and took him into custody. Casselman was convicted of resisting law enforcement, and he appealed.

[22] A panel of this Court concluded the writ of attachment was "not a criminal arrest warrant" and the officer "could not claim the right to exercise the powers associated with the service of such a warrant." 472 N.E.2d at 1312. The Court further determined the officer "was not lawfully engaged in the execution of civil process when . . . he prevented Casselman from closing the door to his home." *Id.* at 1314. Casselman had the right to close his door, and as a result he could not be convicted of resisting law enforcement.

[23] The holding in *Casselman* does not govern here. Casselman was a defendant in a civil suit, but Stickrod was on probation in two criminal cases when he failed to appear in court. The magistrate issued two "Bench Warrants" ordering the sheriff of Tippecanoe County to "arrest" Stickrod and hold him without bond pending the resolution of the criminal cases. Tr. Ex. Vol., State's Exhibits 11 and 12. By contrast, in Casselman's case the court issued a writ of attachment, and he had the option of paying a bond. The Bench Warrants in Stickrod's case were criminal arrest warrants. In addition, in *Casselman* the key issue was whether Casselman could resist the officer's entry into his home. By contrast, the offense of resisting law enforcement is not at issue in Stickrod's case. We conclude the officers' entry into Stickrod's house did not violate the Fourth Amendment, and the trial court did not err in admitting evidence the officers discovered on Stickrod's person after entering the house.

## II. Right to Present a Defense

[24] Stickrod claims the trial court deprived him of his Sixth Amendment right to present a defense by barring Caliz from testifying. The State argues Stickrod has waived this claim for appellate review because: (1) he did not present the Sixth Amendment claim to the trial court; and (2) he did not present an offer of proof describing the substance of Caliz's testimony. After reviewing the record, we conclude Stickrod adequately informed the trial court that his right to present a defense was at issue, and he adequately described Caliz's proposed testimony. We reject the State's waiver claim and turn to the merits.

[25] The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

[26] The Sixth Amendment right to present witnesses in one's defense applies to the states through the Due Process Clause of the Fourteenth Amendment. *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019 (1967). "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.* at 19, 87 S. Ct. at 1923.

[27] The right to present witnesses in one's defense is not unlimited, but rather is subject to "reasonable restrictions" designed to accommodate other legitimate interests in the criminal trial process. *U.S. v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264, 140 L. Ed. 2d 413 (1998). As a result, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to ensure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049, 35 L. Ed. 2d 297 (1973). A rule of procedure or evidence violates the Sixth Amendment when it infringes upon an accused's "weighty" interests and is disproportionate to the purposes that it is designed to serve. *Holmes v. South*

*Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731, 164 L. Ed. 2d 503 (2006) (quotation omitted).

[28] An accused "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 653, 98 L. Ed. 2d. 798 (1988). "[T]here is no right whatever—constitutional or otherwise—for a defendant to use false evidence." *Nix v. Whiteside*, 475 U.S. 157, 173, 106 S. Ct. 988, 997, 89 L. Ed. 2d 123 (1986).

[29] In the current case, after the State rested, the trial court and the parties held a conference outside the presence of the jury. Stickrod's attorney told the court:

> Judge I know I approached before with the possibility of some ethical obligations. I just wanted to put that and make sure it was on the record and if Mr. Stickrod believes that it's an ineffective assistance kind of argument that at least it is on the record for appeal purposes or PCR purpose [sic] but I think my ethical obligations judge is [sic] that I cannot call Mr. Stickrod's girlfriend and I believe that and obviously as an officer of the court that I cannot support any kind of perjury or what I would feel possible falsehood judge so that would be my position just for the record in case there is an issue with ineffective judge.

Tr. Vol. 2, p. 154.

[30] Stickrod objected to his attorney's statement, claiming Caliz's testimony was "imperative for [his] defense" because she would testify that he had been asleep when the officers arrived and that he did not have anything on his person, such as contraband, at the time of his arrest. *Id.* at 156. Stickrod asked the court to

discharge his counsel, accusing counsel of raising the ethical issue for the first time at trial. In response, Stickrod's attorney told the court, "I have explained this to him, I am not risking my law license or anything else on something that I think is unethical and I am not going to call her nor did I plan to call her ever when she came and first met with me." *Id.* at 159. The court denied Stickrod's request to fire his attorney and his request to present Caliz's testimony.[4]

[31] We conclude that the trial court did not err in barring Caliz from testifying. Preventing the presentation of perjured testimony on the stand is a legitimate and substantial interest, and excluding Caliz's testimony was not disproportionate to that interest. *See Makiel v. Butler*, 782 F.3d 882, 910 (7th Cir. 2015) (no error in rejection of habeas corpus petition based on claim of unfair exclusion of witness's testimony; evidence indicated the testimony was false).

[32] Stickrod argues his attorney failed to explain why he thought Caliz would lie on the stand. The attorney's statement to the court that he believed Caliz would perjure herself on the stand was a sufficient basis upon which to exclude her testimony. Whether counsel was incorrect in his belief, or failed to render effective assistance, are matters for post-conviction proceedings.

---

[4] The trial court further stated while excluding Caliz's testimony that she had violated the court's order mandating separation of witnesses by remaining in the courtroom during the trial. We need not address this issue, but the record demonstrates that the court granted the State's motion to separate witnesses at the beginning of the trial. Tr. Vol. 2, p. 59. Further, Stickrod does not challenge the trial court's denial of his pro se request to discharge counsel.

# III. Double Jeopardy

[33]     Stickrod argues his convictions for possession of methamphetamine as Level 5 and Level 6 felonies violate his federal constitutional protection against double jeopardy, and that the court's merger of the counts at sentencing failed to correct the problem. We agree.

[34]     A double jeopardy violation occurs when judgments of conviction are entered for the same criminal act and cannot be remedied by the "practical effect" of concurrent sentences or by merger after conviction has been entered. *West v. State*, 22 N.E.3d 872, 875 (Ind. Ct. App. 2014), *trans. denied*. A trial court's act of merging, without also vacating the conviction, is not sufficient to cure a double jeopardy violation. *Id.* The State agrees that "a separate but merged conviction for [a] lesser included offense cannot stand." Appellee's Br. p. 20.

[35]     The jury determined Stickrod was guilty of possession of methamphetamine as a Level 6 felony, and the trial court entered a "judgment of conviction" on that count. Appellant's App. Vol. II, p. 77. Later, after Stickrod pleaded guilty to possession of methamphetamine as a Level 5 felony, the court entered another judgment of conviction. The court imposed sentences for both convictions of possession of methamphetamine but determined that the two counts would "merge." *Id.* at 10. The entry of judgments of convictions for both counts violated double jeopardy, and merely merging the two convictions at sentencing was insufficient to correct the violation. We reverse the conviction for possession of methamphetamine as a Level 6 felony and remand with

instructions to vacate that conviction. The conviction for possession of methamphetamine as a Level 5 felony remains in effect.

# Conclusion

[36] For the reasons stated above, we affirm the judgment of the trial court in part, reverse in part, and remand with instructions.

[37] Affirmed in part, reversed in part, and remanded.

Bradford, J., and Pyle, J., concur.