## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 23 2018, 10:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shayla Monique Brazier, *Appellant-Defendant,* | August 23, 2018 |
| | Court of Appeals Cause No. 71A03-1712-CR-2949 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable John M. Marnocha, Judge |
| | Trial Court Cause No. 71D02-1706-F3-36 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Shayla Monique Brazier (Brazier), appeals her conviction for robbery, a Level 3 felony, Ind. Code § 35-42-5-1; and conspiracy to commit burglary, a Level 4 felony, I.C. §§ 35-43-2-1(1); -41-5-2.

We affirm.

# ISSUES

Brazier presents two issues on appeal, which we restate as the following:

(1)  Whether the trial court abused its discretion by admitting certain evidence; and

(2)  Whether her Level 3 felony robbery conviction was a result of a unanimous jury verdict.

# FACTS AND PROCEDURAL HISTORY

In 2017, Talanda Peck (Peck) and her three daughters, T.O., aged seven, T.O. aged four, and R.O. aged three, resided at 1814 South Twyckenham, South Bend, Indiana.  In May 29, 2017, Peck went out of town and left her daughters in the care of her nephew Tyshawn Owens (Owens).  Jason Gibson (Gibson) is Owens' longtime friend and he would frequently visit Owens at Peck's home.  Two weeks prior, Peck had informed Owens that she did not want Gibson visiting her home.

[5] On May 29, 2017, against Peck's wishes, Owens invited Gibson to Peck's house. Brazier, who is Gibson's girlfriend, and her one-year old son, spent the night at Peck's home. That night, seven-year-old T.O. encountered Gibson who mistakenly entered her room as he was looking for the restroom. After she directed Gibson to the restroom, she went back to sleep.

[6] The next day, May 30, 2017, Gibson, Brazier, and her son, left Peck's home. Later that morning, Gibson and Brazier went to Deangelo Dove's (Dove), apartment that he shared with his girlfriend Dezarie Parker (Parker), to obtain some "weed." (State's Exh. 52 at 9:00). According to Brazier, Dove and Parker were relocating to Chicago and they needed money for the move. At some point, Dove asked Gibson "whose house can I break into?" and Gibson suggested Peck's home. (State's Ex. 51 at 1:19:34). According to Brazier, Dove intended to sell the property he stole from Peck's home to his "weed man" for money. (State's Ex. 51 at 1:33:00). Sometime that morning, Parker purchased duct tape from the Family Dollar store.

[7] At approximately 11:00 a.m., Peck's home security camera captured Dove entering the house through the front door. A neighbor saw a Buick, which had front-end damage, backed up to the back door. Seven-year-old T.O. then heard commotion, and subsequently saw Gibson and Dove inside her home. Dove used duct tape to tie up Owens, seven-year-old T.O., and four-year-old T.O. Seven-year-old T.O. observed that Dove had a gun in his pocket. Afterward, Dove went into Peck's bedroom where he rummaged the "drawers and . . . stole [Peck's] TV." (Tr. Vol. II, p. 70). There was also a woman, and seven-

year-old T.O. observed that the woman removed "cameras," and a couple of "TVs." (Transcript Vol. II, p. 70). Owens later disclosed to seven-year-old T.O. that the woman was Gibson's girlfriend. In total, Dove, Gibson, and the woman described as Gibson's girlfriend, removed five televisions, cameras, a computer, an iPad, a vacuum cleaner, an old cell phone, and a number of personal items including a pair of Jordan sneakers. After the intruders left, Owens removed the duct tape from himself and the children. The police were then contacted.

[8] That evening, Officer Alexander Gutierrez (Officer Gutierrez) of the South Bend Police Department was out on patrol. At approximately 8:20 p.m., Officer Gutierrez located a Buick that had front end damage at a parking lot. Officer Gutierrez turned his vehicle around, parked it, and waited to "see if [the Buick] was going to move." (Tr. Vol. II, p. 85). When the Buick began leaving the area, Officer Gutierrez followed the vehicle. At some point, the vehicle stopped, and a man matching Dove's description exited the vehicle. The Buick continued to travel, and shortly thereafter, Officer Gutierrez initiated a traffic stop.

[9] The Buick was being driven by Dove's sister, Caprice Guiden (Guiden), and Parker and her son were also inside. The vehicle "was loaded with a lot of . . . electronics [and] some clothing." (Tr. Vol. II, p. 87). Guiden and Parker were arrested and transported to the police station for questioning. During a search of the Buick, the officers located Dove's ATM card on the front passenger seat. Guiden later consented to the search of her home. In Guiden's detached

garage, the police recovered some of the items stolen at Peck's home—*i.e.*, a vacuum cleaner, two televisions, a cell phone, an iPad, and a Jordan shoe box. Gibson's fingerprints were found on the iPad.

[10]     That same evening, Brazier was arrested for questioning. After she was read her *Miranda* rights, Brazier claimed that she had no role in the home invasion. She claimed that earlier that morning, Gibson, Dove, and Parker, had deliberated on committing a robbery of Peck's home. Brazier stated that she agreed to watch Parker's and Dove's baby, so that the baby would not be left alone while the three were out committing the robbery. According to Brazier, at approximately 2:30 p.m., she met up with Dove and Parker to return their baby, and while conversing, Dove and Parker mentioned that they had broken "one or two TVs" while carrying them out of Peck's home. (State's Ex. 51 at 1:44). Afterward, Brazier drove to her mother's apartment. Dove, Parker, and Gibson followed her there. Referring to the items that they had stolen from Peck's house, Gibson asked Dove "where all the stuff at?" and Dove and Parker stated that they had sold the stolen items "to the weed man . . . for half money half weed." (State's Exh. 52, at 12:00).

[11]     On June 5, 2017, the State filed an Information, charging Brazier with Counts I, II, and III, armed robbery, Level 3 felonies. On October 25, 2017, the State filed a Motion to Amend Information and stated,

> 3.  By this motion, the State seeks to amend Counts I, II, and III of the information to allege that [Brazier] [a]ided, [i]nduced, or [c]aused another person in committing the robberies against Tyshawn Owens and the two minor children at [Peck's home].

4. The State also seeks to file an [a]dded Count IV, to charge [c]onspiracy to [c]ommit [b]urglary, a Level 4 [f]elony. This charge also relates to the same conduct that forms the basis for Counts I, II, and III of the [I]nformation, but focuses on the alleged agreement that [Brazier] and others made leading up to the offense.

(Appellant's App. Vol. II, p. 100).

[12] On November 13, 2017, ahead of Brazier's jury trial, the trial court conducted a hearing on Brazier's motion to suppress any in-court identification testimony from seven-year-old T.O., and four-year-old T.O. At the close of the suppression hearing, the trial court determined that four-year-old T.O. did not understand the "nature of an oath and a promise to tell the truth," and was therefore an incompetent witness. (Tr. Vol. II, p. 16). However, the trial court determined that seven-year-old T.O., had sufficient recollection of the home invasion, and there was "in sufficient [sic] detail" that seven-year-old T.O. had been susceptible to "any sort of outside influence" that would taint her "in-court identification" of the robbers. (Tr. Vol. II, p. 17).

[13] The trial court afterward proceeded with Brazier's jury trial, which concluded on November 15, 2017. At the close of the evidence, the jury found Brazier guilty of Count I, Level 3 felony armed robbery, and Count IV, Level 4 conspiracy to commit burglary. On December 13, 2017, the trial court conducted a sentencing hearing, and subsequently sentenced Brazier to concurrent terms of nine years on each offense in the Department of Correction (DOC). However, the trial court suspended five years of each offense to

probation, and further ordered Brazier to serve probation for twelve months following her release from the DOC.

[14] Brazier now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## A. *In-Court Identification*

[15] Brazier challenges the trial court's denial of her motion to suppress the testimony of seven-year-old T.O.'s in-court identification that depicts her as one of the robbers. We note, however, that Brazier did not file an interlocutory appeal. Rather, she proceeded to trial. Once a case proceeds to trial, the question of whether the trial court erred in denying a motion to suppress is no longer viable. *Baird v. State*, 854 N.E.2d 398, 403 (Ind. Ct. App. 2006), *trans. denied*. A ruling upon a pretrial motion to suppress is not intended to serve as the final determination of admissibility because it was subject to modification at trial. *Id*. On appeal, Brazier's only available argument is whether the trial court abused its discretion in admitting T.O.'s in-court identification testimony at trial. *Id*.

[16] The admission or exclusion of evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012).

[17] During the trial, when the State elicited T.O.'s in-court identification, Brazier did not object. "[F]ailure to make a contemporaneous objection to the admission of evidence at trial, so as to provide the trial court an opportunity to make a final ruling on the matter in the context in which the evidence is introduced, results in waiver of the error on appeal." *Brown v. State*, 783 N.E.2d 1121, 1125 (Ind. 2003). Absent a showing of fundamental error, a party may not raise an issue on appeal when that issue was not raised at trial. *Hornback v. State*, 693 N.E.2d 81, 84 (Ind. Ct. App. 1998). Brazier did not make a contemporaneous objection to the admission of T.O.'s in-court identification. Furthermore, Brazier does not argue that fundamental error occurred as a result of the admission. Waiver notwithstanding, we address her claim on the merits.

[18] Due process of law under the Fourteenth Amendment requires suppression of testimony concerning a pretrial identification when the procedure employed is impermissibly suggestive. *Harris v. State*, 716 N.E.2d 406, 410 (Ind. 1999). Nevertheless, a witness who participates in an improper pretrial identification procedure may still identify a defendant in-court if the totality of the circumstances shows clearly and convincingly that the witness has an independent basis for the in-court identification. *Young v. State*, 700 N.E.2d 1143, 1146 (Ind. 1998).

[19] To determine whether a witness had an independent basis for the in-court identification, we consider the following factors: (1) the amount of time the witness was in the presence of the perpetrator; (2) the distance between the witness and the perpetrator; (3) the lighting conditions at the time; (4) the

witness's degree of attention to the perpetrator; (5) the witness's capacity for observation; (6) the witness's opportunity to perceive particular characteristics of the perpetrator; (7) the accuracy of any prior description of the perpetrator by the witness; (8) the witness's level of certainty at the pretrial identification; and (9) the length of time between the crime and the identification. *Id.*

[20] Brazier argues that

> In the present case, there was not an adequate independent basis for T.O.'s in-court identification. According to T.O.'s testimony, the male was the person who taped up T.O. and not the female. There is no evidence on the record as to the length of time that T.O. was in the presence of the woman. Furthermore, there is no evidence in the record as to the distance that T.O. was from the woman nor is there any evidence of the lighting conditions at the time. T.O.'s capacity for observation is also questionable, given that at the hearing on the motion to suppress she said that [T.O.] and [four-year-old T.O. were] in her mother's bedroom when they heard a noise[,] and at trial she stated they were in the living room when they heard a noise. Furthermore, . . . T.O.'s only description of the woman is that she was black and had an afro. She couldn't remember any other details.

(Appellant's Br. p. 18).

[21] Seven-year-old T.O. testified that "two boys and one girl" committed the robbery in her home. (Suppression Tr. p. 5). T.O. identified one of the men as Gibson, and she stated that she knew Gibson because he regularly visited her home to "rap" with Owens "on the computer." (Suppression Tr. p. 5). Based on previous encounters, T.O. accurately identified Gibson as one of the robbers. Also, T.O. provided a precise description of Dove as the other perpetrator. T.O. testified that the third robber was a woman she had never met before, and

she described the woman as a "little fat and a little skinny," and her "skin was black and her hair was in an afro." (Suppression Tr. p. 5). T.O. stated that while the robbery was taking place, she looked at the woman "for two seconds," but looked away because the woman was looking at her. (Suppression Tr. p. 9). T.O. testified that it was Owens who later disclosed to her that the woman was Gibson's girlfriend. T.O. added that the woman—Gibson's girlfriend—took "the cameras and [she] ran upstairs to take the other TVs." (Suppression Tr. p. 7). T.O. stated that the robbers, Dove, Gibson, and Gibson's girlfriend, were in her "house for like five minutes or [] ten minutes." (Suppression Tr. p. 8). When asked the distance between Gibson's girlfriend and herself, T.O. testified that she was "closer". (Suppression Tr. p. 8).

[22] At Brazier's jury trial, T.O. consistently testified that the first time she saw the woman who assisted Dove and Gibson in the robbery was during the home invasion. When asked if she could identify the woman, T.O. first described the woman's race as African-American and added that the woman "had an afro." (Tr. Vol. II, p. 68). Twice, T.O. was asked to give other descriptive features of the woman, but T.O. shrugged her "shoulders," and at that moment she offered "no response." (Tr. Vol. II, p. 69). However, when T.O. was asked to point at the woman whom she had seen during the robbery, she pointed at Brazier. When asked how she found out that Brazier was Gibson's girlfriend, T.O. stated, "[B]ecause I saw her in my house." (Tr. Vol. II, p. 69). T.O. was then asked what role Brazier played during the robbery, and T.O. stated that Brazier took "cameras" and "went upstairs and took the TVs." (Tr. Vol. II, p. 70). At

some point during her direct examination, T.O. described Brazier physique as "kind of fat, kind of skinny." (Tr. Vol. II, p. 76).

[23] Brazier argues that T.O.'s description of her became more accurate only after Owens informed T.O., ahead of the jury trial, that she was Gibson's girlfriend. In turn, the State argues that

> First, the record is clear that [T.O.] was not subjected to any suggestive pretrial identification procedures prior to making her in-court identification, nor does [Brazier] make any argument that she was []. [T.O.] was not taken to do a show-up identification and was not shown a photo array or any photograph of [Brazier]. There is also no evidence in the record that she was exposed to any pretrial media reports about the robbery or ever had anyone identify [Brazier] to her as the robber. Rather, at both the pre-trial hearing and during her trial testimony, [T.O.] consistently testified that the robbery was the first time she had ever seen [Brazier], that she had not ever seen [Brazier] again after the robbery until that day in court, and that she had not been shown any pictures of [Brazier] since the crime.

(Appellees' Br. pp. 11-12) (internal citations omitted).

[24] Although Owens informed T.O. that Brazier was Gibson's girlfriend, thereby implying that T.O. was exposed to suggestive pre-trial identification, we find that T.O.'s in-court identification did not rest on any post-robbery knowledge. Considering the factors identified in *Young,* we find that the ten minutes that the robbers were inside Peck's home, was sufficient time for T.O. to be able to observe and identify the robbers. T.O.'s description of Brazier was consistent at both the suppression hearing and at trial. T.O. testified that she was close to Brazier, and that they looked directly at each other during the robbery. T.O.

stated that Brazier was "kind of fat, kind of skinny." (Tr. Vol. II, p. 70). T.O. then described Brazier's race as African-American and that Brazier had "afro hair." (Tr. Vol. II, pp. 68, 76). Notably, the robbery occurred around mid-morning, so the record supports the inference that the lighting was reasonably good. Referring to Brazier, T.O. confidently stated, "I saw her in my house," and she took "cameras" and "went upstairs and took the TVs." (Tr. Vol. II, pp., 69, 70). Here, we find no indication that T.O. was ever equivocal in her identification of Brazier, and in view of the totality of the circumstances, we conclude that T.O. had an independent basis upon which to identify Brazier in court as a perpetrator to the robbery. Accordingly, we conclude that the trial court did not abuse its discretion in admitting T.O.'s in-court identification of Brazier.

## B. *Unanimous Verdict*

[25] Brazier argues that at her jury trial, "the State's theory shifted between Brazier actually participating in the home invasion and being present [in] removing items . . . from [Peck's] house to watching [Parker's] child so that [Dove, Parker, and Gibson] could commit the robbery." (Appellant's Br. p. 19). Brazier then argues, "[b]ased upon these mutually exclusive theories of guilt advanced by the State, it is impossible to determine whether or not the jury actually reached a unanimous verdict in the case." (Appellant's Br. p. 20).

[26] Here, the State advanced alternative theories about Brazier's criminal liability with respect to the Level 3 felony robbery offense, namely, either that she was

guilty of: (1) personally committing the robbery with Dove and Gibson; or (2) aiding or abetting in the robbery. The trial court instructed the jury on accomplice liability. Under the theory of accomplice liability, a person who knowingly or intentionally aids, induces, or causes another person to commit a crime is guilty of committing that crime himself. *See* Ind. Code § 35-41-2-4; *also see*, *Brooks v. State*, 895 N.E.2d 130, 133 (Ind. Ct. App. 2008). To be convicted as an accomplice, there must be affirmative evidence showing the defendant was acting in concert with the principal in the commission of the crime. *Brooks*, 895 N.E.2d at 133-34.

[27] "There is no distinction between the criminal responsibility of a principal and that of an accomplice." *Norvell v. State*, 960 N.E.2d 165, 168 (Ind. Ct. App. 2011). A person may be convicted as an accomplice even if he was charged as a principal; in fact, the State may even change its theory of liability during the trial itself. *See Suggs*, 883 N.E.2d at 1192. Therefore, "individual jurors themselves need not choose among the theories, so long as each is convinced of guilt."' *Taylor v. State*, 840 N.E.2d 324, 334 (Ind. 2006).

[28] In *Taylor*, the State pursued two theories on how the defendant could be guilty of murder, either by killing the victim or by aiding and abetting another person to kill the victim. *Taylor*, 840 N.E.2d at 331. Taylor argued in part that the jury should have been instructed that in order to convict him of murder, the verdict had to be unanimous on one of the two prosecution theories. *Id*. at 332. Our supreme court observed that the jury had to determine only whether Taylor committed one act of murder either as the principal or as an accomplice and

noted that Taylor would have been equally guilty of murder whether he acted as the principal shooter or merely as an accomplice. *Id*. at 333.

[29] In the instant case, the State presented evidence that Brazier was present during the robbery, and that she removed televisions and cameras from Peck's home. That evidence was sufficient to prove that Brazier acted as a principal. When the police interviewed Brazier, Brazier acknowledged that she was aware of the planned robbery, and she stated that she agreed to babysit Parker's child to enable Parker, Dove, and Gibson to execute the robbery at Peck's home. Indeed, this evidence was sufficient to sustain Brazier's conviction for robbery as an accomplice.

[30] In *Taylor*, our supreme court held that the "[t]he jury need not unanimously agree on the precise factual details of how [an offense] occurred in order to convict." *Id*. at 334 (citation and quotation marks omitted). Instead, "the jury must agree unanimously that each element of the charged crime has been proved." *Id*. Applying the rationale advanced in *Taylor* to the present case, and because there was sufficient evidence to convict Brazier of her charged offense under either of the State's theory, we conclude that the jury did not need to reach a unanimous verdict.

## CONCLUSION

[31] For the foregoing reasons, we conclude that the trial court did not abuse its discretion by admitting T.O.'s testimony, and the evidence was sufficient to convict Brazier of robbery either as a principal or as an accomplice.

[32]    Affirmed.

[33]    Vaidik, C. J. and Kirsch, J. concur