## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 26 2020, 8:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Patrick Duffy,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 26, 2020

Court of Appeals Case No.
19A-CR-713

Appeal from the Floyd Circuit Court

The Honorable J. Terrence Cody, Judge

Trial Court Cause No.
22C01-1611-MR-2284

**Tavitas, Judge.**

# Case Summary

[1] James Duffy appeals his convictions and sentences for murder, a felony; armed robbery, a Level 3 felony; and auto theft, a Level 6 felony. We affirm.

# Issues

[2] Duffy raises three issues, which we consolidate and restate as:

> I. Whether the trial court abused its discretion by excluding the videotaped interview of a witness and whether the exclusion denied Duffy his right to present a defense.
>
> II. Whether Duffy's sentence is inappropriate.

# Facts

[3] Sixty-eight-year-old Lewis Morrison worked at the American Legion post near his Floyds Knobs residence. Morrison often carried a black bag, which contained a large amount of cash, and Morrison also carried large amounts of cash in his wallet. Morrison was a friend of Stacie Chapman's mother. Chapman needed a place to live, and in January 2016, Morrison allowed Chapman to move into the basement apartment of his residence.

[4] In the early morning hours of November 5, 2016, Chapman and her friends, Duffy, Chelsea Wilson, and Brad Benningfield used methamphetamine in Chapman's basement apartment. At approximately 5:00 a.m., Duffy, Wilson, and Benningfield left the residence, and Chapman went to a nearby McDonald's to get breakfast. Morrison arrived at the American Legion at 5:38 a.m. for work. Chapman returned to Morrison's home to eat her breakfast and

was at the residence when Morrison returned from the American Legion shortly after 7:00 a.m. As Chapman was getting ready, Duffy called her and asked what she was doing. Chapman told Duffy that she was getting ready to go to Madison to see her uncle. At approximately 8:00 a.m., Chapman left the residence, stopped to run errands, and drove toward Madison.

[5] Duffy, Wilson, and Benningfield were driving around in Duffy's green Chrysler Sebring vehicle "killing some time," but they intended to "rob [Morrison's] house." Tr. Vol. VII p. 23. Duffy was aware that Morrison often carried significant amounts of cash. At approximately 8:15 a.m., Morrison's neighbor saw a small green car with three occupants in the neighborhood. The neighbor saw a white male wearing a black hoodie and a black cap get out of the car and run toward Morrison's residence. The neighbor then saw the other two occupants drive the car away from the neighborhood. According to Wilson, she and Benningfield dropped Duffy off at Morrison's residence so that Duffy could rob Morrison. When Duffy got out of the vehicle, he had a 9-millimeter handgun. Duffy told Wilson "he'd meet back up with [her] after." *Id.* at 26.

[6] Duffy's vehicle was recorded on a school's security camera leaving the area at 8:18 a.m. Wilson and Benningfield went to a nearby gas station in Duffy's vehicle. At 8:43 a.m., Duffy texted Wilson for her to pick him up at Morrison's home. At 8:44 a.m., Duffy then texted Chapman, "Can I come by." Ex. Vol. 11 p. 89. Chapman responded that she was on her way to Madison. Duffy then texted Wilson not to come back to Morrison's home.

[7]     At 12:30 p.m., a neighbor saw Morrison's truck leave the subdivision with one occupant. Duffy, who was driving Morrison's truck, met with Wilson at her friend's house. Duffy told Wilson that he shot Morrison and said, "It was either him or me." Tr. Vol. VII p. 27. Wilson then followed Duffy to Louisville, Kentucky, where he left Morrison's truck in a parking lot. When he got into the vehicle with Wilson, Duffy was carrying a black drawstring bag and two handguns—the 9-millimeter handgun, which he had earlier, and a silver revolver.

[8]     When Chapman arrived home shortly before 1:00 p.m., the door to the basement was open, which was unusual. Chapman discovered Morrison upstairs on the floor and called 911. Officer Andrew Benson was dispatched to Morrison's residence and made contact with Chapman. Officer Benson entered the open door to the basement and saw muddy footprints on the carpet leading to the stairs. Officers entered the residence and discovered Morrison's dead body. Morrison was face down on the floor of the laundry room near the door to the garage. Morrison's white truck was missing.

[9]     The basement had been "ransacked," and muddy footprints led from the basement door to the stairwell leading upstairs. Tr. Vol. IV p. 11. The living room, which was located at the top of the stairwell, led into the kitchen and laundry room. The main level of the house had also been ransacked. A bullet hole was found in the wall near the top of the stairwell, and another bullet hole was found in a wall in the kitchen. Bullet holes and casings were found from the stairwell to the laundry room. In all, seven shots were fired.

[10]     Morrison sustained four gunshot wounds—three gunshot wounds to the back and one to the back of the head. The gunshot to the head and one of the gunshots to the back would have been fatal. The gunshot to the head would have caused "death within a couple minutes," and the fatal gunshot to the back would have resulted in Morrison "coughing up blood" but still being "able to move around somewhat." *Id.* at 167.

[11]     Evidence found at the scene demonstrated that Morrison confronted the intruder in the stairwell, and the intruder shot at Morrison. Morrison tried to escape through the living room and kitchen but was shot and fell in the laundry room. As Morrison was on the floor of the laundry room, he was shot another three times and died in the laundry room.

[12]     Upon learning that a small green car was seen in Morrison's neighborhood that morning, the detectives questioned Chapman regarding the vehicle. Chapman identified Duffy as the possible owner and driver of the green vehicle. Officers located Duffy's vehicle at his parents' residence and learned that there was a warrant for Duffy's arrest. When they arrived at the residence, Duffy and Wilson were in a pole barn next to the house. Wilson was helping Duffy count the money from Morrison's residence at that time. Both Duffy and Wilson ran, but Wilson was quickly apprehended. Duffy ran into a nearby wooded area, and officers stopped pursuing Duffy after they heard a gunshot. In the pole barn, officers found a black bag, a glove, ammunition for a .38-caliber handgun, a couple of knives, a 9-millimeter magazine, and $1,429 in cash. The black bag was identified as belonging to Morrison.

[13]     Three or four hours later, a homeowner a few miles away called 911 to report that he found a sleeping man, later identified as Duffy, with two guns in his garage. The homeowner reported that he was holding the subject at gunpoint. Duffy was found in possession of a 9-millimeter Taurus handgun, a .38-caliber revolver, and $1,375.00 in cash. Morrison was the owner of the .38-caliber revolver. The 9-millimeter Taurus was later identified as the weapon used to shoot Morrison.

[14]     On November 7, 2016, the State charged Duffy with murder and armed robbery, a Level 3 felony. In a separate cause, the State charged Duffy with auto theft, a Level 6 felony. The State later moved to join the auto theft charge with the murder and armed robbery charges, which the trial court granted. The State also charged Wilson with murder and robbery. Wilson pleaded guilty to robbery, a Level 2 felony, and was sentenced to twenty years in the Department of Correction ("DOC") with two years suspended.

[15]     At Duffy's January 2019 jury trial, Duffy sought to introduce Defendant's Exhibit DDD, which was a videotaped interview of Wilson eleven days after Morrison's death in which Wilson implicates Duffy.[1] The State objected to the admission of the exhibit, and the trial court sustained the objection.

---

[1] Duffy also sought to introduce Defendant's Exhibit CCC, which was a recording of Wilson's conversation with a detective after Wilson was arrested, in which she denied any involvement or knowledge of the incident. The trial court also sustained the State's objection to the admission of this exhibit. On appeal, Duffy does not raise an argument regarding this exhibit.

[16]  The jury found Duffy guilty as charged. The trial court found four aggravators: (1) Duffy's criminal history; (2) Morrison's age; (3) Duffy was in violation of the conditions of his home detention when he committed these offenses; and (4) "the harm, injury, or loss, particularly the harm suffered by Mr. Morrison . . . was significant and was greater than the elements necessary to prove the commission of the crime of murder." Tr. Vol. X p. 155. The trial court found no mitigating circumstances. The trial court sentenced Duffy to: sixty-five years for murder; sixteen years for armed robbery; and two and one-half years for auto theft. The trial court ordered that the sentences be served consecutively for an aggregate sentence of eighty-three and one-half years in the DOC. Duffy now appeals.

## Analysis

### I. Exclusion of Evidence

[17]  Duffy argues that the trial court abused its discretion by excluding Wilson's police interview. The trial court has broad discretion to rule on the admissibility of evidence. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017). We review rulings on the admissibility of evidence for an abuse of discretion. *Id.* An abuse of discretion occurs "when admission is clearly against the logic and effect of the facts and circumstances." *Id.* "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party." *Turben v. State*, 726 N.E.2d 1245, 1247 (Ind. 2000); Ind. Trial Rule 61.

[18] Relatedly, Duffy also argues that the exclusion of the statement violated his Sixth Amendment right to present a defense.

> The Sixth Amendment right to present witnesses in one's defense applies to the states through the Due Process Clause of the Fourteenth Amendment. *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.* at 19, 87 S. Ct. at 1923.

*Stickrod v. State*, 108 N.E.3d 385, 391 (Ind. Ct. App. 2018), *trans. denied.* "[B]efore a federal constitutional error can be held harmless, [however,] the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).

[19] At trial, Duffy argued that Wilson's statement to the police was admissible as substantive evidence under Indiana Evidence Rule 801(d).[2] On appeal, Duffy contends that the statement was admissible not to prove the truth of the matter, but rather "to challenge [Wilson's] evolving narrative by showing her demeanor while articulating it." Appellant's Br. p. 20. Duffy argues that Wilson's "credibility and demeanor while accusing Duffy of murder were essential for

---

[2] Duffy specifically did not seek to impeach Wilson with the statement.

the jury to assess whether she was telling the truth about Duffy or was simply trying to please law enforcement to get a beneficial plea agreement." *Id.* at 21.

[20] We need not address whether the statement was admissible as substantive evidence, however, because any error in the exclusion of the statement was harmless beyond a reasonable doubt. During Wilson's testimony, it was clear that Wilson was required to testify against Duffy as part of her plea agreement and that the murder charge against Wilson was dismissed as part of the plea agreement. The jury was well aware of Wilson's changing stories, plea agreement, substance abuse issues, criminal history, and credibility issues. The prior statement, which was, for the most part, consistent with her testimony, would not have further impacted Wilson's credibility.

[21] Moreover, Duffy incorrectly argues that "this case came down to a credibility contest between [Wilson] and the defense" and that "[t]he primary and only direct evidence against Duffy was [Wilson's] testimony." Appellant's Br. pp. 22-23. Aside from Wilson's testimony, there was significant evidence of Duffy's involvement in the murder and robbery. Earlier that morning, Duffy was driving his green Chrysler Sebring. A neighbor saw a small green vehicle in front of Morrison's residence on the morning of the robbery. The neighbor saw a man get out of the vehicle and run toward Morrison's residence. That evening, when police attempted to arrest Duffy in his parents' garage, Duffy and Wilson ran. Wilson was quickly apprehended, and Duffy was found a few hours later hiding in another garage. At Duffy's parents' garage, officers found a black bag, a glove, ammunition for a .38-caliber handgun, a couple of knives,

a 9-millimeter magazine, and $1,429 in cash. The black bag was identified as belonging to Morrison. In the garage where Duffy was hiding, officers found a 9-millimeter Taurus handgun, a .38-caliber revolver, and $1,375.00 in cash. Morrison was the owner of the .38-caliber revolver, and the 9-millimeter Taurus was later identified as the weapon used to shoot Morrison.

[22] Given that Wilson's credibility was already substantially challenged by Duffy and the overwhelming evidence of Duffy's guilt, any error in the exclusion of Wilson's statement to the police as substantive evidence is harmless beyond a reasonable doubt. *See, e.g., Hall v. State*, 36 N.E.3d 459, 470 (Ind. 2015) (holding that the trial court's ruling regarding a child molestation victim's alleged prior false allegation of sexual misconduct was erroneous but that the error was harmless beyond a reasonable doubt where the victim immediately reported the molestation, the defendant's semen was present on the victim's shorts, and the victim had fresh genital lacerations).

## II. Inappropriate Sentence

[23] Duffy contends that his sentence is inappropriate. Indiana Appellate Rule 7(B) provides that this court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Wilson v. State,* 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied.*

[24] In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference." *Sanders v. State,* 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008)), *trans. denied.* In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "if another sentence might be *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *Id.* at 844 (citing *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)). When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081.

[25] Here, Duffy was convicted of murder; armed robbery, a Level 3 felony; and auto theft, a Level 6 felony. The sentencing range for murder is forty-five to sixty-five years with an advisory sentence of fifty-five years. *See* Ind. Code § 35-50-2-3. The trial court sentenced Duffy to sixty-five years in the DOC for the murder conviction. The sentencing range for a Level 3 felony is six to twenty years with an advisory sentence of ten years. *See* I.C. § 35-50-2-5. The trial court sentenced Duffy to sixteen years for the robbery conviction. The sentencing range for a Level 6 felony is six months to three years with an advisory sentence of one and one-half years. *See* I.C. § 35-50-2-7. The trial court sentenced Duffy to two and one-half years for the auto theft conviction. The trial court then ordered the sentences to be served consecutively, for an aggregate sentence of eighty-three and one-half years in the DOC. Duffy requests that we revise his sentences to advisory, concurrent sentences.

[26] Regarding the nature of the offense, Duffy argues that the "murder was not drawn out and was not committed with a brutality not already inherent in the nature of any murder offense." Appellant's Br. p. 32. We disagree. Duffy entered sixty-eight-year-old Morrison's home with the intent to rob Morrison. Duffy, who was friends with Morrison's tenant, Chapman, used methamphetamine in the basement apartment with Chapman earlier that morning, and was aware that Morrison often carried significant amounts of cash. Upon entering the home, Duffy started firing gunshots at Morrison and chased Morrison through the residence, firing at Morrison as Morrison tried to get away.

[27] The evidence at the scene demonstrated that, as Morrison was entering the laundry room, a bullet struck his back and exited through his chin, and he fell due to this "incapacitating shot." Tr. Vol. VI p. 60. This wound would have resulted in Morrison "coughing up blood" but still being "able to move around somewhat." Tr. Vol. IV p. 167. While Morrison was face down on the floor, Duffy "st[ood] over him" and shot Morrison another three times. Tr. Vol. VI p. 60. One of those wounds was to the back of the head and would have caused "death within a couple minutes." Tr. Vol. IV p. 167. Duffy then spent the next several hours ransacking Morrison's residence. Duffy stole Morrison's cash, gun, and vehicle. Later that day, when officers were attempting to take Duffy into custody, he ran and fired a gunshot. Duffy was found a few hours later sleeping under a pool table in another homeowner's garage with two guns—

including the gun used to kill Morrison—and part of Morrison's cash. Duffy's depraved, heartless actions do not warrant a revision of his sentence.

[28] Regarding the character of the offender, Duffy argues none of his prior criminal offenses involve violence and he had a drug addiction. The record reveals that twenty-seven-year-old Duffy began abusing substances at the age of twelve, eventually abusing marijuana, Xanax, pain pills, methamphetamine, and heroin. He had convictions for possession of a controlled substance (twice), unlawful possession of a syringe (three times), invasion of privacy, resisting law enforcement, public intoxication, and possession of methamphetamine. He had pending charges for escape, a Level 6 felony; burglary, a Level 5 felony; criminal recklessness, a Level 6 felony; carrying a handgun without a license, a Class A misdemeanor; and carrying a handgun without a license, a Level 5 felony. Duffy is a member of the Gaylords gang, and he was in violation of the conditions of his home detention when he committed these offenses. Although Duffy has had numerous opportunities to change his behavior, Duffy's criminal conduct only escalated, leading to the instant offenses. Duffy's criminal activities demonstrate a disdain for the rule of law and reflect poorly on his character.

[29] Based on the foregoing, we cannot say that Duffy's aggregate eighty-three and one-half year sentence is inappropriate in light of the nature of the offenses and the character of the offender.

# Conclusion

[30] Any error in the exclusion of Wilson's police interviews was harmless error. Duffy's sentence is not inappropriate in light of the nature of the offenses and the character of the offender. We affirm.

[31] Affirmed.

Najam, J., and Vaidik, J., concur.